[Civ. No. 6010. First Appellate District, Division One.—January 26, 1928.]

ALYCE GEE, Respondent, v. FONG POY, etc., Appellant.

Peter S. Sommer and Nat Schmulowitz for Appellant.

James M. Hanley and Donahue, Hynes & Hamlin for Respondent.

PARKER, J., *pro tem.*—This is an appeal from a judgment rendered in an action for slander growing out of certain statements alleged to have been made by the defendant concerning plaintiff. The case was tried by the court

sitting with a jury, and a verdict returned in favor of plaintiff and assessing damages against said defendant in the sum of five thousand five hundred dollars. Upon the verdict judgment was entered as indicated.

Both plaintiff and defendant are Chinese. The main complaint and, indeed, the sole complaint of appellant is that owing to misconduct of counsel for plaintiff the defendant was denied a fair trial in the court below. This ground embraces many factors all intimately connected therewith. When we state that the misconduct alleged is the sole complaint it may be understood that we include therein the effects of this misconduct as evidenced by the verdict and judgment.

In order that there may be an application of the law relative thereto it is necessary to detail in some particularity the facts of the case and the history of its trial.

The complaint sets up three causes of action, each alleging a separate slander, though in each instance the slanderous words alleged to have been spoken are practically the same, and all within a short period of time. In the first cause of action plaintiff alleges that on or about March 1, 1924, the defendant telephoned the mother of plaintiff and at that time and in the ensuing conversation spoke of plaintiff as follows: "Fanny is worse than a prostitute"—the Fanny referred to being the wife of defendant—"You better take care of Alyce; she is doing the same thing as Fanny"—Alyce being the name of the plaintiff herein.

In the second cause of action it is alleged that on or about March 8, 1924, at the home of the mother of defendant's wife the defendant spoke of plaintiff as follows: "Alyce was going with Fanny; she is worse than a prostitute."

The third cause of action sets up that on the ninth day of March, 1924, at the Chinese cemetery in the county of San Mateo, in the presence of more than one hundred people, defendant spoke and uttered of and concerning plaintiff as follows: When the plaintiff asked the defendant, "Why do you say talk about me behind my back, that I am worse than a prostitute?" the defendant replied, "Yes, I said that you act like it." The plaintiff replied, "I can go to court about this; you have no proof," and the defendant answered, "Any time I go. Any time I go." The plaintiff answered, "You know that I am not. How can you say I

am?'' The defendant replied, ''You better go whitewash yourself. You walk like one.''

In each cause of action there are accompanying allegations of the words being false and defamatory and prompted and actuated by actual malice, hatred, and ill will of defendant toward plaintiff; likewise allegations concerning the use and meaning of the words employed. There are no allegations of special damage, and punitive damages are asked.

There is no question raised as to the sufficiency of the complaint, and therefore the allegations are merely outlined to indicate the slanderous words charged.

The answer of the defendant is a categorical denial of the allegations of each cause of action.

Upon the issues thus joined the verdict of the jury was in favor of plaintiff.

No specific contention is made that the evidence is insufficient to sustain the verdict. No claim of error is predicated upon the instructions given or refused. Excessiveness of verdict is not urged other than the claim of appellant that its size is of the utmost importance in determining the effect of the alleged misconduct.

The plaintiff is an American-born Chinese girl aged, at the time of trial, nineteen. She was at different times a worker in a factory, waitress in a tea-room, helper in a Chinese herb establishment, and at the time of trial a waitress in a Chinese restaurant. The defendant is a Chinese herb doctor aged, at the time of trial, forty-two. The plaintiff, as a young girl and up to the time of the happening of the events around which the issues center, had been a close friend and chum of one Fanny Ng, who in 1919 became the wife of the defendant. The plaintiff was a frequent visitor at the home of defendant and was at some time in his employ, mixing herbs and medicines. The wife of defendant and the plaintiff, after the marriage of the former, continued their friendly relations and visited back and forth with frequent regularity. The plaintiff was permitted to show, over the objection of defendant, that upon one of her visits to the house of defendant in November, 1923, defendant made improper advances to her accompanied with ardent professions of affection; that when she repelled his advances he then offered her money in consideration of her remaining silent as to the episode and particularly re-

fraining from disclosing the incident to the wife of the defendant—the purpose of this testimony being to show that because plaintiff had spurned the proffered love of defendant the latter became angry and vindictive toward her, and out of this actual malice came the words complained of. Irrespective of this incident, however, there seems to have been no open breach in the general relations of the parties or cessation of general family friendship and intimacy. On or about March 3, 1924, the defendant intercepted a letter addressed to his wife, Fanny, which letter tended to disclose a relationship between the wife and a Chinese man. In the letter were many expressions of endearment and anticipation of renewal of past association. It also contained statements of the writer that he had seen the plaintiff Alyce, and from the context it could easily be inferred that Alyce had knowledge of the clandestine relationship. On the same morning that defendant came into possession of the letter the wife became aware of the fact that the letter had been intercepted by her husband and some words ensued between them. The wife threatened self-destruction and left her home. Defendant, becoming aware of her departure, endeavored to locate her, and it was in this endeavor that he first called by telephone the mother of the plaintiff here. In the ensuing conversation, it was testified by the mother, defendant used the words complained of, referring to his wife as a prostitute and likewise classifying the plaintiff. The efforts of the husband to locate his wife proved futile until the afternoon of the day of her departure he learned that she had committed suicide at the home of one of her relatives. Thereafter and during the period between the death and burial of the wife it was in evidence that at a family gathering, where there were present many Chinese people, the defendant condemned the activities of the wife and emphasized her immoral conduct, likening her to a prostitute. At that time he again associated the plaintiff with the wife, and referred to the former as likewise a prostitute and a bad woman. On the day of the funeral and at the place of interment at the brink of the grave plaintiff approached the defendant and asked him why he had talked about her and applied to her the word "prostitute," and cautioned the defendant that she could take him into court for this; where-

upon defendant again repeated the slanderous words, with the further statement that she, the plaintiff, should white-wash herself, and assuring her further that he was willing to go to court at any time. All of this occurred and the language used being in the presence and hearing of many people.

This practically is the evidence upon which the verdict finds support. The defendant denied making any of the statements or using any of the slanderous words charged as against plaintiff. He offered testimony supporting his defense, and further to show that the plaintiff was being urged and encouraged by others of the Chinese race to harass and scold him and cause him trouble and annoyance. It was also shown at the trial that the defendant is a man of some wealth, having an income of at least one thousand dollars a month and owning property in excess of one hundred and fifty thousand dollars.

The trial of the case covered twelve days, exclusive of the week-end recess from Friday until Monday following.

With this synopsis of the facts before us we now approach the contention of the appellant and set forth the acts and conduct complained of.

The first witness called by plaintiff was the defendant under the provisions of section 2055 of the Code of Civil Procedure. In the course of his examination by plaintiff he was asked concerning his acquaintance with two Chinese girls named Grace Moy and Rosie Ng, and it was admitted by him that these two girls came over and stayed at his home all the night of Saturday, March 1, 1924. Then these questions were asked him and these proceedings had:

"Q. You had trouble with your wife about the two children, didn't you? A. No, not two children, with my wife.

"Q. Didn't you and your wife have a row because you attempted to get in the bed of the two little girls? A. No, no such thing.

"Mr. Crosby (counsel for defendant): Wait just a minute—we object to that as incompetent, irrelevant and immaterial and not responsive to any issues raised by the pleadings.

"The Court (after repeating the question): I presume the plaintiff was one of them.

"Mr. Hanley (counsel for plaintiff) : No, she was not. I will withdraw the question for a minute. I will ask to have these two little girls brought into the room."

These girls were then brought into the courtroom, being Chinese girls of the age of fifteen years. Nothing further along this line was attempted during the examination of the defendant.

The mother of plaintiff, to whom the first slanderous words were addressed, testifying as a witness for the plaintiff, was asked on cross-examination as to the employment of plaintiff by the defendant at a time after the alleged incident wherein defendant had made advances toward plaintiff. Defendant sought to show the wages paid plaintiff upon the theory that it would show she was working to earn money and get pay and thus controvert the inference of insult some weeks before. Whereupon Mr. Hanley, counsel for plaintiff, interjected this : "We have a right to show that after he was satisfied, after his wife did it, he still had the rottenness in his make-up and he wanted to get it out of his system, and he wanted to get it out of his system at his wife's funeral, because he caused his wife to kill herself, and"— At this point he was stopped by the court on the ground that this was argumentative, and the cross-examination proceeded.

On the third day of the trial plaintiff called as a witness Grace Moy, one of the young Chinese girls who were called into court for identification at the time of defendant's examination. This witness testified to visiting the home of defendant on the night of March 2d and testified to the events of the evening, going to a show and to a lunch and finally going to bed at about 1 A. M. with the wife of the defendant and another girl, Rosie Ng, sister of defendant's wife. Then the plaintiff, after much discussion and argument between counsel and over the objection of defendant, was permitted to show by this witness that after the three named retired the door was broken open and the defendant, clad in pajamas, entered the room in an excited and exciting manner and attempted to get in bed with the girls; that the wife tried to shield them and finally fought off the defendant, who thereupon turned and went out of the room; that the wife of defendant thereupon got the girls out of bed and dressed and started to leave the house, but

were met by defendant, who assured them they would not be further disturbed, whereupon they returned to bed. They left the house about 5 A. M. on Sunday morning, March 2d, accompanied by the wife.

Counsel for defendant interposed frequent objections to this line of testimony on the general grounds of irrelevancy, incompetency, and immateriality, further specifying that the asking of the questions eliciting this testimony was prejudicial misconduct, and offered and designed solely for the purpose of discrediting the defendant in the eyes of the jury. During the argument the following occurred:

"Mr. Hanley (plaintiff's counsel): We will show not only that he did these things but that it was known to his wife, and that he and his wife rowed in the bedroom because of his conduct at that time. We are going to show that he forced the woman to go away, made her arm black and blue, causing her to leave with the girls on the first Key Route that pulled out in the morning at 5 o'clock. It is to show that the contention of the defendant in this, that he went into this talk because of certain letters that he received, is not true."

The court at the outset in overruling the objection of defendant took the view that plaintiff could prove by circumstantial evidence that the letter claimed to have been intercepted was a fabrication, and in this effort plaintiff might show facts from which this might be inferred. However, the court qualified the admission by stating that if it developed that the evidence was absolutely immaterial and should not have been admitted the court would entertain a motion to strike. Counsel for defendant thereupon made this statement: "We apprise the court now of the vice of such an admission. The force of what they are seeking to offer will have exercised its influence, will have been heard by the jury. And regardless of how any human being may attempt to cause to pass from his memory such things as this it cannot be done. And to admit anything with the right to strike it out is securing the defendant no security whatever of his right against a design purposely to injure him in matters that do not concern the case."

"The Court: Well, that is not the *avowed* purpose of the offer to make this proof. The testimony will be admitted."

After the testimony of the witness on this subject had been

given, defendant renewed his motion to strike, and the court stated there had been no sufficient connection, whereupon counsel for plaintiff said: "We propose to follow it up with testimony of other people."

Upon further objection by defendant, the court asked counsel for plaintiff if he undertook to connect it up, and Mr. Hanley, for plaintiff, replied that it was his intention to show that from the friendly relations existing between defendant's wife and plaintiff the defendant knew that the wife had told plaintiff of the incident of the bedroom, and that it was an element of his malice that he would close the mouth of plaintiff by defaming her. The court thereupon reserved its ruling on the motion to strike to see whether it was connected up or not, in the light of plaintiff's undertaking to connect up and show the materiality and competency of the testimony.

Thereafter plaintiff called as a witness Rose Ng, a Chinese girl of the age of fifteen years. This witness, over the objection of defendant, gave similar testimony as to the occurrence when defendant is said to have entered the bedroom of these young girls. Defendant throughout objected strenuously and at sufficiently frequent intervals, on each occasion further specifying and assigning the propounding of these questions to elicit that testimony as prejudicial misconduct on the part of counsel for plaintiff, being solely for the purpose of prejudicing the rights of the defendant before the jury. The court stated that the testimony was admissible on the question of punitive damages. Plaintiff's counsel again asserted his position as follows: "And the purpose of it is to show malice, that all of the subsequent acts of this defendant were brought about by malice because he knew that the young lady, the plaintiff, was in possession of certain knowledge with reference to his conduct, and he wanted to besmirch her character as a matter of protection for himself. That is our position." Counsel for plaintiff further argued the admissibility of the testimony as a circumstance to explain the real cause of the difficulty between defendant and his wife, rebutting the testimony given by defendant. The court again remarked, "I think, as I thought the other day, the testimony was admissible, and I think so now."

In the course of the argument Mr. Hanley, counsel for plaintiff, said: "I do not want to comment again on the letter (meaning the intercepted letter to the wife) except in so far as it bears out inferentially and circumstantially the contention of the plaintiff that this letter was written either personally or at the instigation of the defendant." This statement was assigned by defendant as prejudicial misconduct and purposely designed by counsel to cast aspersion upon the character and the integrity of defendant. As the testimony referred to was being given defendant renewed his objections and the court stated: "Overruled. It may be considered that defendant is deemed to raise the same objection to every question asked on this line, and the ruling of the court will be the same."

At the conclusion of the testimony of the witness Rose Ng a motion to strike was made by defendant on the grounds previously urged, calling the court's attention to the promise of plaintiff to make the necessary connection. Counsel for plaintiff then stated that neither Rome nor the earth was made in one day, and that he expected to complete the connection when the plaintiff took the stand, but could not do it until that time.

When the plaintiff was being interrogated by her counsel she was asked concerning the incident of November, 1923, when it was alleged that defendant had made improper advances to her. On objection of defendant the court said, addressing counsel for plaintiff, "You offer it on the same theory that you offer what occurred on the night of the 1st and 2nd of March of last year?" to which counsel replied "Yes," and the court said, "The objection is overruled. If you don't connect it up thoroughly it will go out on motion." Thereafter, while plaintiff was a witness, an offer was made to show that the deceased wife told plaintiff of the occurrence of the bedroom, and upon objection of defendant the evidence was excluded.

At the close of plaintiff's case or when plaintiff announced she rested her case, defendant renewed his motion to strike out all of the testimony concerning the alleged happenings of the night in question, renewing in his motion all of the assignments of error, prejudice, and misconduct. This motion was granted by consent of all parties, and the jury were instructed to wholly ignore and dis-

regard the testimony so stricken out. The court, in concluding its instructions to the jury on this point, asked the jury if they could and would so disregard the stricken testimony, and they replied affirmatively. The admonition of the court was thorough and sufficient in itself and as complete as any such instruction should be.

Later, during the presentation of defendant's case, the defendant offered testimony concerning the relationship of the deceased wife with the alleged author of the letter in dispute. Upon objection of plaintiff to the relevancy or materiality of this testimony defendant took the stand that inasmuch as plaintiff had argued that the letter was a fabrication he was entitled to rebut that inference and show its genuineness. Whereupon counsel stipulated, and pursuant to such stipulation, the court instructed the jury, that under the testimony and the stipulation of counsel, in deliberating upon a verdict it should be taken as a fact established by the testimony that the defendant did not write or cause to be written the said letter.

Plaintiff before resting her case presented the certificate of a physician that a certain witness who had been under subpoena could not be present and that her condition was such that her presence could not be secured for some ten or twelve days. Counsel for plaintiff stated that the testimony of the absent witness was merely in the nature of cumulative evidence. It was stated that the absent witness could testify to a conversation of March 2d with the defendant and others. The subject of the conversation had already been gone into quite extensively by others present.

We have thus at length detailed the testimony taken and proceedings had as the questions raised compel such a statement. It may be repeated here that the defendant stood on a straight denial. He did not plead justification in any way nor did he set up the truth of the statements nor claim privilege. With the case thus summarized we may proceed with the claim of appellant.

Appellant bases his right to a reversal upon the ground that the offer of testimony covering the night of the alleged occurrence in the home of defendant was itself misconduct, and was made designedly to prejudice the rights of defendant and deny him a fair hearing on the merits; further, that the action of the court in admitting the same was error,

and likewise of such damaging effect to his cause that the subsequent order striking it out was of no avail to cure the harm already done. Still further, appellant insists that even if there had been a connection sufficient to persuade the court to let the testimony remain it was still irrelevant, incompetent and immaterial.

The ground upon which respondent urged the testimony to be admissible and upon which the court admitted it on counsel's promise to connect was that it would tend to establish actual malice as the basis of exemplary damages. In other words, plaintiff argued that she was entitled to show that defendant had been guilty of serious misconduct toward the young girls involved, and that defendant knew that plaintiff had knowledge of these acts on his part, and that defendant with a purpose and design of forcing plaintiff to remain silent, or, failing in this, to discredit her in advance, spread these defamatory charges of and concerning her. Respondent has cited no authority either here or in the court below supporting her contention.

The question of just what may be shown to establish malice in fact in actions has been before the courts of this state many times (*Davis* v. *Hearst*, 160 Cal. 143, 166 [116 Pac. 530]; *Scott* v. *Times-Mirror*, 181 Cal. 345 [12 A. L. R. 1007, 184 Pac. 672]; *Snively* v. *Record Publishing Co.*, 185 Cal. 565 [198 Pac. 1]). The subject is exhaustively covered by Odgers in his work on Libel and Slander (5th ed., p. 348), and likewise by Newell on the same subject (3d ed., p. 937) and by Townsend in his work (4th ed., p. 653). From the authorities cited herein and those cited to support the text of the writers on the subject it is manifest that there can be no basis for the claim here made. Repeating, respondent cites us to no authority or line of reasoning in support of his contention, and we do not feel the case now warrants a review of all that may have been written or said by the courts on the subject. Suffice it to say that if the rule contended for should be approved, then the trial of slander and libel cases would be interminable affairs of endless and confusing issues. Every act of a defendant's life that would in anywise disgrace him or cause him fear of exposure could be brought into issue upon the simple announcement that the defendant knew that the plaintiff was in possession of accusing facts against him, and

that the defendant was therefore malicious in his statements as to the plaintiff. We do not approve such a theory and decline to establish such a doctrine as the law of this jurisdiction.

Of course, it is apparent that acts of defendant in relation to plaintiff, or acts between the parties to the action, are not under discussion here.

Therefore, with reference to the testimony here under discussion, the court should not have admitted it either upon a promise to connect or at all. The court was apprised of counsel's theory at the outset and should have declined to admit the testimony on the theory advanced. In any event, the action of the court in the admission of the objectionable matter is not specifically urged. ▇ However, with the premise established that the testimony itself was inadmissible and improperly before the court and jury, we come to the contention that the acts of counsel in offering the same constituted prejudicial misconduct sufficient to warrant a judgment of reversal herein.

The concrete question presented is this: If evidence of a nature tending to degrade and vilify a party is admitted improperly under a promise of counsel to connect the same in such a manner as to render it admissible, and subsequently there is an admitted failure to so connect, what effect will the admission of such evidence have upon a verdict rendered after all of the said evidence has been stricken from the record?

That the testimony complained of was calculated to and necessarily would prejudice the defendant before any jury admits of little question. For seven trial days this testimony was being introduced or else indirectly referred to and before the jury under the expressed opinion of the court that it considered the same material. It surely cannot require argument beyond the facts hereinbefore stated to demonstrate that the offering and acceptance of this line of testimony was highly prejudicial and harmful to appellant. The defendant in this case was a native of China and of the Mongolian race. As stated, we deem further discussion and analysis of the facts unnecessary to support the conclusion that the admission of the testimony was prejudicial to the rights of the defendant.

Next we reach the question as to the effect of the order striking the testimony from the record, and the instruction and admonition to the jury to disregard the same.

Many cases are cited on this subject, and we may quote without comment therefrom. The greater number of cases are those wherein defendant was charged with the commission of some public offense. However, the reasoning of those cases is applicable alike to all cases irrespective of what the issues may be. Without attempting any historical or chronological development, we cite from a very recent case:

"It is clear that however good the intentions of the jury, or however sincere they may be in endeavoring to follow the instructions of the court to disregard such suggestions, it is well nigh inevitable that they should give weight to such suggestions. It is a psychological impossibility for the jury to wholly eradicate the impression made by such questions from their minds in weighing the evidence as to the guilt or innocence of the defendant on the particular item charged. The question of the district attorney asked of the defendant amounted to a charge against the defendant that he had been guilty of the offense of rape upon two small girls in his custody. The human mind is not so constituted that a thing of this kind can be either forgotten or overlooked by a jury. . . . The real question is, has the defendant had a fair trial?" (*People* v. *Anthony*, 185 Cal. 152 [196 Pac. 47].) See, also, *People* v. *Tufts*, 167 Cal. 266 [139 Pac. 78].

"While it is the general rule that if it fairly can be said from all of the circumstances of the case considered in conjunction with the nature and extent of the assigned misconduct that an admonition of the court had the desired effect, there can be no just cause for complaint, nevertheless it is a recognized exception to that rule that where, in a closely balanced criminal case, misconduct is repeated and persisted in despite the warnings and admonitions of the trial court, and is so pronounced and pernicious that it is not in human nature to forget or disregard its pernicious effect, then manifestly a mere admonition or any number of admonitions will not suffice to right the wrong done, and the only remedy remaining is to be found in a reversal of the judgment. (*People* v. *Edgar*, 34 Cal. App. 471 [17 Pac. 895].)

In another case, referring to the asking of improper questions, the court says: "The plain effect of the statement was that the prosecution had such proofs but could not make them because the law of evidence prevented such course. (*People* v. *Fleming*, 166 Cal. 357 [Ann. Cas. 1915B, 881, 36 Pac. 291].)

"When counsel are permitted to state facts in argument, and to comment upon them, the usage of courts regulating trials is departed from, the laws of evidence are violated and the full benefit of trial by jury denied. It may be said in answer to these views that the statements of counsel are not evidence, that the court is bound to so instruct the jury, and that they are sworn to render their verdict only according to the evidence. All this is true; yet the necessary effect is to bring the statements of counsel to bear upon the verdict with more or less force according to circumstances; and if they, in the slightest degree, influence the finding, the law is violated, and the purity and impartiality of the trial tarnished and weakened.

"It is true that the attorney for the prosecution was not permitted by the court to comment at any length upon the facts which he himself imported into the case; but while this was to the credit of the court it does not change the fact that a matter not in evidence and of a nature clearly prejudicial to the defendants was laid before the jury for the purpose of affecting their verdict; and it is no answer to this to say that the jury may have disregarded it. It is unreasonable to believe that the jury will entirely disregard it. They may struggle to disregard it; they may think they have done so, and still be led involuntarily to shape their verdict under their influence." (*People* v. *Ah Len*, 92 Cal. 282 [27 Am. St. Rep. 103, 28 Pac. 286].)

As indicated, the foregoing citations are all from cases wherein defendant was being prosecuted for a criminal offense, and where the defendant was surrounded by the presumptions usually attaching to a defendant in a criminal case, wherein the law requires proof of guilt to be established beyond any reasonable doubt. However, the reasoning as to the impossibility of erasing from the minds of the jurors the effects of evidence improperly before them applies with equal force to the trial of a civil case. That

little distinction is made on this point a brief examination will disclose.

In the case of *Shay* v. *Horr*, 78 Wash. 667 [139 Pac. 604], quoted in the case *Dameron* v. *Ansbro*, 39 Cal. App. 298 [178 Pac. 878], it is said: "We have held that it is improper to either directly or indirectly get before the jury any fact which conveys the information that the defendant is insured against loss in case of a recovery against it, and that the striking of the answers conveying such information and the instructing of the jury not to consider it will not save the error."

In the case of *Lafargue* v. *United Railroads*, 183 Cal. 720 [192 Pac. 538], the prevailing opinion held that the conduct complained of was improper, but that the harm was overcome by the action of the trial court, and, further, that whether or not prejudicial harm resulted was for the trial judge to determine on the motion made for a new trial. The dissent in this case, concurred in by three of the court, Justices Wilbur, Olney, and Lennon, reads as follows: "It seems that a false quantity was injected into the case by plaintiff's counsel, over the repeated admonition of the court, and that the false quantity so introduced was of a character so prejudicial to defendant as to have prevented the jury from considering the case fairly upon its real merits. To sustain the verdict under these circumstances will, it seems to us, have the effect of encouraging similar conduct in other cases, when it should be discouraged strongly."

The case of *Keena* v. *United Railroads of San Francisco*, 197 Cal. 148 [239 Pac. 1061], affords an interesting illustration. When this case was before the district court of appeal the court considered the misconduct complained of and pronounced the same as clearly subject to criticism. But in view of the judgment of affirmance in the case of *Lafargue* v. *United Railroads, supra*, the court was not prepared to hold that the situation demanded a reversal of the cause. A petition for rehearing was granted in the supreme court, and the opinion of the latter tribunal is found in 197 Cal. at page 148. The supreme court adopted *in toto* the opinion of the district court up to the point of misconduct of counsel, and the judgment was reversed solely on the ground that the misconduct of the attorney for plaintiff prejudicially and materially affected the substantial rights

of the defendant and prevented it from having a fair trial. The court adopted the language of the dissent in the Lafargue case, *supra*. The supreme court says: "It is altogether too evident that the purpose of the accusation that evidence had been wilfully suppressed by the defendants was none other than to bolster up a weak case by creating a prejudice against the defendants in the minds of the members of the jury. Such means of winning a lawsuit cannot be commended or receive recognition or endorsement by this court, instituted and maintained on the principle of administering justice."

In considering the language thus used it seems clear that by the term "bolstering up a weak case" the idea of the court intended to be expressed was "a case that might be weak." This is apparent from the fact that the trial judge, the district court of appeal, and the supreme court all considered the facts sufficient to sustain the judgment.

Passing from our own state, we have authority from many jurisdictions. (See *Laughlin* v. *Brassil*, 187 N. Y. 128 [79 N. E. 854].)

In *Lopresti* v. *Sulkin*, 49 Pa. Super. Ct. 417, appears this language, commenting upon alleged misconduct of counsel: "But there are certain kinds of objectionable remarks which have been held to be so prejudicial in their nature as to be beyond correction by any admonition the court may give the jury to disregard them." Cited and approved in *Dannals* v. *Sylvania Twp.*, 225 Pa. 156 [99 Atl. 475].

In the case of *Rinehart & Dennis* v. *Brown*, 137 Va. 670 [120 S. E. 269], many authorities are reviewed and the question extensively discussed in all of its phases. The court adopts the rule, namely, "If it appears that the unfavorable influence of the argument was probably not wholly removed by the court's action a new trial should be allowed." Further quoting from this case: "Counsel for plaintiff lay stress upon the fact that the trial court was emphatic in instructing the jury to disregard the improper reference to the insurance, and obtained from them an indication that they understood the court's instruction. We do not attach special importance to these facts."

In *Coon* v. *Manley* (Tex. Civ. App.), [196 S. W. 606], it is said: "It is true the court seems to have promptly acted in the endeavor to have excluded from the jury the harm-

ful and irrelevant matter referred to; but the references to the subject matter were so frequent and pointed, even after repeated rulings of the court, that we do not think appellee can now complain because of the conclusion which, as it seems to us, is quite natural, that the vice and harmful effect of the matter objected to were not destroyed by the court's rulings.''

Also, in *Kirby Lumber Co.* v. *Youngblood* (Tex. Civ. App.), [192 S. W. 1109], another Texas authority, we find this statement: ''When the seeds of passion and prejudice are sown and fall in fallow ground it is difficult indeed to destroy its effect, even by most careful admonition and painstaking instructions; and when counsel, either in their argument to the jury or during the trial, in the presence of the jury, go outside of the record and indulge in remarks that are clearly intended to arouse the passion or prejudice of the jury and likely to influence them, such conduct not only authorizes but requires the trial court to set aside the verdict, and this should be done even though the court may have instructed the jury to disregard such argument.''

An ancient case, *Stewart* v. *Huntingdon Bank*, 11 Serg. & R. (Pa.) 267 [14 Am. Dec. 631], sets forth the conditions prevalent even then. We quote: ''It has grown into a habit within these few years for counsel to propose a chain of evidence, the first links of which depend upon those to follow and would not be supportable without them. Now, although gentlemen of honor—and such I take counsel in this cause to be—would scorn to impose on the court by pledging themselves for what they knew they could not perform, yet it may happen that there may be others who would make no scruple of liberal promises provided they could smuggle into the jury-box a piece of evidence which ought not to get there.''

In the case of *State* v. *Meader*, 54 Vt. 126, we find this language: ''It is now the settled law in this state that illegal evidence, if objected to, though admitted under an offer to so connect it with other proofs as to make it competent, will vitiate a verdict for the party offering it if the proposed connection is not established, unless the court is able to say affirmatively that such evidence worked no injury to the adverse party. It is not apparent how any

embarrassment can arise in the trial of cases under this rule. The party offering such evidence is simply compelled to take the risk of the experiment. If he fails he, not his adversary, should be the loser. He has no more right to hold a verdict obtained by such evidence, when offered in good faith, than one when he offers the evidence in bad faith. The rights of the adversary are imperiled to the same extent in either case, and these are the rights calling for protection. The rule has a tendency to discourage bad faith in parties, in their offers of evidence, as they understand that such evidence cannot ultimately aid them.''

No further citation of authority seems necessary.

In the case at bar plaintiff urges her good faith in the premises and her attempt to connect the testimony under discussion here. This, of course, must appear from the record, if at all. We assume that all counsel act in good faith generally speaking. But good faith in the abstract is not an all-saving virtue. Here it appears, as a demonstration of good faith, that a witness under subpoena could not appear. However, the statement of counsel to the court was that the testimony of this witness was purely cumulative; and in explanation of this counsel referred to the incident and the occasion concerning which she would testify, and this record discloses that several witnesses had already given testimony concerning the same matter. There is not a single word in the record or offer of proof or statement of counsel to the effect that testimony to connect was or had been available, or that counsel had any reason to believe in his ability to so connect. Plaintiff's counsel had stated that he could connect by the testimony of plaintiff. When plaintiff was called and objection made, the court inquired of plaintiff's counsel if the knowledge upon which they based their contention could be brought home to defendant; whereupon counsel for plaintiff replied, ''I don't know that. I won't say that because I don't want to promise something that I may not be able to meet. But so there will be no question about it we withdraw the question.''

Respondent here contends she made the offer to connect by attempting to show by plaintiff whether the deceased wife discussed with her what happened on the night in question, but was precluded from so doing owing to appel-

lant's sustained objection. We have held hereinbefore that the evidence would have been inadmissible, even if connected; but on this particular phase we might add that the testimony offered would not tend to connect the defendant except remotely, and that the essential connection would be defendant's knowledge of what information had been conveyed to plaintiff. We deem it futile to follow this phase further. Quoting from *Smith* v. *Sedalia*, 182 Mo. 9 [81 S. W. 167]: "It is in the discretion of the trial court to allow counsel some choice as to the order in which they will introduce their evidence, but when counsel have been permitted to introduce evidence out of its usual order on the assurance that it will be connected and its relevancy shown later, if the promised evidence is not brought forward, and if the irrelevant evidence is of a character likely to influence the jury, and if the verdict is on that side, a new trial should be granted. The fact that the promise may have been made in good faith does not alter the effect of the illegal evidence. In this instance there had been a change of venue and a change of counsel since the former trial, and doubtless the counsel who gave the promise expected they would be able to fulfill it, but in that respect they were disappointed." A new trial was granted.

It must be added that throughout the trial to the time the evidence was stricken out it was for seven days being constantly urged and argued; that throughout the trial there was constant and continuous strife between counsel, often requiring the caution of the court, and throughout this strife were interjected side remarks and comments reflecting on the defendant and his cause, and drawing unfair inferences from the death of the wife, as instanced by the statement of plaintiff's counsel hereinbefore referred to, and also the statement of counsel for plaintiff that he would show that she was pregnant at the time. It is unnecessary to further detail these other than to illustrate the atmosphere created and the "fallow ground into which were cast the seeds of prejudice and passion."

We conclude the conduct complained of was harmful and prejudicial, and prevented the defendant from having a fair and impartial trial on the issues submitted.

We are again confronted by section 4½, article VI, of the state constitution, and are called upon to determine

whether or not from the errors complained of there has been a miscarriage of justice.

Notwithstanding an abundance of authority going to an explanation and construction of this constitutional provision, from necessity its application depends upon each particular case as it arises. Whatever else may be said on the subject it is clear that the intent of the provision was to promote justice rather than obstruct it. It was intended, in our opinion, to insist upon substantial compliance with the law, the very foundation of justice. If there had been a substantial compliance with the law then alleged or admitted irregularities should not prevail to change a result which it might be apparent would have resulted notwithstanding. But the effect of this provision is not to permit a reviewing court to simply scan the alleged rights of one party and deny the other any rights at all. The term "justice" includes the idea of equality, and in some instances the terms are used interchangeably. The law necessarily represents and embodies man's highest concept of human justice as between individuals. Under our system no man can be said to have had justice accorded to him who has not had the opportunity to present his case and have that case heard dispassionately and fairly. To say that you can bring a person into court and, before the presentation of his case to a jury, by offering incompetent and irrelevant testimony, disgrace and degrade him to a degree that both he and his case may be deemed unworthy to be heard and he subject to punishment, and that thereby you are not infringing upon his right to a fair and impartial hearing, is to declare what is obviously absurd. In the Keena case, before cited, it appeared that the plaintiff had been injured by the loss of a child; that two juries had passed upon the sufficiency of the evidence as well as two trial judges; that in the district court of appeal and in the supreme court there was no question on that score, nor were there any errors complained of other than the conduct referred to; the supreme court nevertheless took the view that the substantial rights of the defendant had been impaired and that justice must have miscarried. Surely the constitutional provision was intended to prevent a miscarriage of justice and not to condone it. The present chief justice of the supreme court in *People* v. *DeVries,* 52 Cal. App. 711

[199 Pac. 870], uses this apt language: "There are bounds beyond which the saving grace of this provision may not pass, and the appellate courts should not be called upon to spread it, like 'a mantle of sweet charity,' over intentional acts of misconduct. Frequent warnings in relation to the practice governing proving ineffectual, reversals on appeal must be anticipated if the right of defendants to a fair trial is to prevail." In any event, applying the section to the case here, there is little to invoke the constitutional provision. Without further commentary we repeat that section 4½ of article VI does not compel that we halt in this case.

Counsel involved in the case are all men of highest repute in the profession. But that does not alter the situation. It simply demonstrates the necessity for some restraining influence. In the instant case, again, when defendant's counsel was making some argument to the court he was interrupted by counsel for plaintiff, and answered the interruption by stating that he was addressing the court, whereupon plaintiff's counsel replied: "But the jury is sitting here and hears it." It is unfortunate to note—and every trial judge has noted—that a trial before a jury is often a battle of wits between opposing counsel, and an occasion for delicate finesse and elusive insinuation. Modern thought and discussion seem to leave the layman with the impression that there is something deficient in the administration of justice. The courts must sooner or later meet the question and present the remedy. And we think a great step in anticipation is to give some assurance to the profession and the litigant that in a case where issues are framed the trial will be confined thereto.

Judgment reversed.

Knight, Acting P. J., and Cashin, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 26, 1928.

All the Justices concurred.