[Civ. No. 21384.    First Dist., Div. Two.    May 15, 1964.]

JOSEPH BALISTRERI, Plaintiff and Respondent, v. ED TURNER, Defendant and Appellant.

Jennings, Haid, Gartland & Tilly and James E. Burns for Defendant and Appellant.

Nathan Cohn and Michael Berger for Plaintiff and Respondent.

SHOEMAKER, P. J.—Plaintiff Joseph Balistreri brought this action against defendants Ed Turner and Richard Burnside to recover damages for assault and battery. Count one of the complaint alleged that defendant Burnside, while acting as the agent of defendant Turner, did wilfully and without provocation strike and injure plaintiff. Count two of the complaint alleged a conspiracy between defendants Turner and Burnside to maliciously assault and injure plaintiff.

Upon the failure of defendant Burnside to appear at the trial, his default was entered. The case then proceeded, before a jury, against Turner as the sole defendant. Upon the conclusion of the trial, verdict and judgment were for plaintiff against defendant Turner. Defendant Turner appeals therefrom.

The evidence shows that plaintiff is a seaman who joined the Marine Cooks and Stewards Union in 1957, after completing a bakery course at its training school. He began "shipping out" in 1958 and, by the fall of 1960, had served tours of duty aboard four different ships, the last of which was the "President Cleveland." During the period from March until

November 1960, while plaintiff was serving on the Cleveland, defendant Turner, who was then campaigning for reelection to the office of secretary-treasurer of the union, came aboard the ship. Plaintiff and fellow crew members, upon concluding that defendant Turner was unwilling to answer questions concerning union funds, decided to support "Spud" Robinson, who was also running for said office.

Defendant Turner had served as secretary-treasurer of the union continuously since January 1957. This office was the highest in the union, and the incumbent served on all committees ex officio. Defendant Turner also possessed certain appointive powers. In July or August 1960, defendant Turner appointed one "Buck" Mercer, whom he had known for some eight or nine years, to the office of "patrolman." Mercer had previously been elected a "patrolman" in Seattle and came to San Francisco at the request of defendant Turner. The administration slate included defendant Turner and Mercer, who was running for the office of "Portland Agent."

Sometime in October or early November 1960, Richard Burnside, who was a longtime acquaintance of Mercer's, arrived in San Francisco. Although neither Burnside nor Mercer testified at the trial, the depositions of both were read into evidence. Burnside stated that he came to San Francisco in order to enroll in the training school and thereby qualify for employment through the union. He evinced considerable uncertainty as to the date of his first meeting with Turner. In a deposition taken on March 2, 1961, Burnside stated that he was introduced to Turner shortly after his arrival, and, on November 15, 1960, gave the latter his application to attend training school. In a second deposition taken on November 30, 1962, Burnside stated that he did not meet Turner until some two weeks later, either in late November or early December 1960. Mercer admitted, in a deposition taken on November 15, 1962, that he had encountered Burnside in Los Angeles sometime before the latter came to San Francisco and that he had loaned him five or six dollars at that time. He denied, however, that he had suggested that Burnside come to San Francisco.

Meanwhile, on November 11, 1960, plaintiff completed his tour of duty aboard the Cleveland and began actively campaigning for Robinson. At approximately 3:30 on the afternoon of November 17, 1960, plaintiff was in front of the union hall distributing leaflets opposing the administration. While plaintiff was so occupied, Burnside struck him on the

jaw and rendered him momentarily unconscious. When plaintiff recovered, he pursued Burnside around the block and saw him enter the back door of the union hall and run up the stairs toward the union offices. Although plaintiff and two companions watched both the front and back doors of the hall, Burnside failed to emerge. Plaintiff thereafter called the police and together they were unable to find Burnside.

Burnside, in the earlier of his two depositions, stated that he had spent the morning of November 17, 1960, hanging around the union hall and drinking with one Jordan. At approximately 3:30 in the afternoon, Burnside began to argue with Jordan over certain money which the latter owed him. While the two men were standing in front of the union hall, Jordan stated that he did not intend to pay back the money. Jordan then made a threatening gesture, and Burnside swung at him and struck plaintiff by mistake.

In his second deposition, Burnside stated that this version of the assault was false, and that in actuality ''Buck'' Mercer had suggested to him that plaintiff needed a beating or ''needed the heat put on him,'' and he had agreed to do it. When asked whether he had inquired of Mercer why plaintiff needed a beating, he replied that he was not interested in the reason and that he had agreed to do it ''[j]ust like that.'' When asked whether Mercer had offered to pay him for this service, he stated that Mercer had mentioned the sum of $20, but ''[w]hether I was offered it out and out for doing it or personal I don't know.'' He further stated that on numerous occasions following the assault, Mercer had loaned him money which he had never repaid. Immediately after his conversation with Mercer, Burnside talked with Jordan, and the two men worked out a plan whereby Jordan would engage plaintiff in conversation and Burnside would pretend to swing at Jordan and strike plaintiff. Following the execution of this plan, Burnside ran around the corner and then met with Mercer, who had previously agreed to wait for him. Since Burnside's hand was injured, Mercer took him to a doctor, who treated his hand but never billed him for this service.

On November 19, 1960, Burnside was notified that he had been admitted to the training school, which was operated by a corporation of which Turner served as president. Burnside left for school on November 21, 1960, and did not visit San Francisco until some two or three weeks later. On this occasion, he met with Mercer and was told not to worry because

"[e]verything would be taken care of." Burnside also received one or more visits from defendant Turner while he was attending training school. When criminal assault charges were subsequently brought against Burnside, he was represented by Mr. Gartland, a member of the same firm who are attorneys of record for defendant Turner. Burnside stated that he had heard someone mention Mr. Gartland's name and that he had then looked it up in the telephone directory. Burnside never paid a fee for Mr. Gartland's legal services. In February 1961, Burnside completed his training course and qualified for a "B" shipping classification identical to that held by plaintiff. He began shipping out in June 1961.

Mercer's deposition was substantially in accord with Burnside's as to the manner in which the assault upon plaintiff came about. Mercer admitted that he had pointed plaintiff out to Burnside and had stated that plaintiff "ought to have a head put on him." When asked whether he had ever informed anyone that he had hired Burnside to hit plaintiff, he stated that he could have done so. He denied having agreed to meet Burnside after the assault and stated that he found him seated in his car in the basement garage of the union hall and thereafter agreed to take him to a doctor.

Both Mercer and Burnside denied that Turner had ever suggested that they assault plaintiff. Turner similarly denied having made any such suggestion.

Plaintiff testified that some two or three weeks after the assault, he encountered Turner in the union hall coffee shop. As plaintiff handed a pamphlet to a man by the name of Rybers, Turner clenched his fists and advanced on plaintiff. When plaintiff told Turner to keep away, he cursed plaintiff and stated that he was going to put him on nonseniority so that he would never ship out of the union hall again. A few months after this incident, plaintiff again encountered Turner in the coffee shop. On this occasion, Turner informed plaintiff that the federal government was looking for him in connection with back taxes. Some three or four days later, plaintiff did in fact hear from the federal government and was required to produce his tax records for the last three years. On yet a third occasion, plaintiff encountered Turner in the elevator at the union hall. Plaintiff testified that Turner cursed him and took off his glasses. When the elevator stopped at the next floor, plaintiff got out and informed Turner that if he wanted to do anything to plaintiff, he could do it in front of witnesses.

Plaintiff also testified that he repeatedly attempted to ship out subsequent to the assault but was never assigned a job. He stated that on one occasion, a man named Hughes, who had a shipping classification lower than plaintiff's, was given a job in preference to him. The dispatcher, one Elmiro LaRue, was an appointee of defendant Turner. When plaintiff applied to the joint classification committee to have his ''B'' shipping classification elevated to an ''A'' classification, the committee, at a meeting attended by Turner, refused to do so for the reason that plaintiff had received unfavorable working reports. Plaintiff's claims of discriminatory employment practices by the union were subsequently determined by the National Labor Relations Board to be without merit.

Turner denied the coffee shop and elevator incidents, and further denied that plaintiff's inability to ship out was the result of discrimination.

Upon this evidence, the jury returned a verdict in favor of plaintiff and against Turner, assessing compensatory damages in the sum of $9,000 and punitive damages in the sum of $10,000. Upon defendant's motion for new trial, the court ordered the motion granted upon the ground of insufficiency of the evidence unless plaintiff filed a consent to accept $2,500 as compensatory damages in lieu of the amount set by the verdict. Upon the filing of such consent, Turner filed notice of appeal from the judgment, as modified.

Appellant first contends that the judgment must be reversed for the reason that the evidence was insufficient as a matter of law to support the jury's implied finding that Burnside was acting as an agent or coconspirator of appellant when he assaulted respondent.[1] This contention cannot be sustained.

In cases where the existence of a conspiracy is alleged, the law recognizes that the persons engaged in such an undertaking do not generally leave a recognizable trail of their activities and that direct evidence of a conspiracy can usually be secured only if one of the conspirators confessed. (*Ramey* v. *General Petroleum Corp.* (1959) 173 Cal.App.2d 386, 404-405 [343 P.2d 787]; *Johnstone* v. *Morris* (1930) 210 Cal. 580, 590 [292 P. 970].) Proof of a combination linking two or more defendants may accordingly be inferred from indirect and circumstantial evidence, such as the nature of the acts done, the relationship of the parties, their interest

---

[1] For convenience of discussion, the order of appellant's arguments has been reversed.

and other circumstances. (*Agnew* v. *Parks* (1959) 172 Cal. App.2d 756, 774 [343 P.2d 118]; *Revert* v. *Hesse* (1920) 184 Cal. 295, 301 [193 P. 943]; *Biggs* v. *Tourtas* (1949) 92 Cal. App.2d 316, 322 [206 P.2d 871].)　█　It is not necessary that the plaintiff produce evidence showing that the parties met and actually agreed to undertake the performance of the unlawful acts. (*Alfred M. Lewis, Inc.* v. *Warehousemen etc. Local No. 542* (1958) 163 Cal.App.2d 771, 778-779 [330 P.2d 53].)

█　In the instant case, appellant had an obvious motive for discouraging respondent from campaigning against the administration slate. There was also evidence of a relationship between appellant, Mercer and Burnside, since appellant had appointed Mercer a union "patrolman" some three or four months prior to the assault on respondent, and Burnside, who came to San Francisco after encountering Mercer in Los Angeles, admitted in his earlier deposition that he met appellant shortly after his arrival. Mercer admitted that Burnside assaulted respondent at his suggestion. Immediately following the assault, Burnside entered the union hall and proceeded to the upstairs floor where appellant's office was located. Within two days of the assault, Burnside was notified that he had been admitted to the training school of which appellant was president. While Burnside was attending the school, he received at least one visit from appellant and was subsequently represented in the criminal assault proceedings by a member of the firm who were attorneys of record for appellant. Under such circumstances, we cannot say that the evidence was insufficient as a matter of law to support the inference that the assault upon respondent was in furtherance of a conspiracy between appellant, Mercer and Burnside.

Appellant next contends that respondent's counsel was guilty of flagrant misconduct in repeatedly asking improper questions and making prejudicial remarks before the jury. We agree. It would serve no useful purpose to set forth in detail each of the cited instances of misconduct. However, we have selected typical examples of counsel for respondent's method of approach.[2]

---

[2] "Q. [Respondent's counsel, during examination of appellant pursuant to Code Civ. Proc., § 2055.] You don't have too much difficulty with the members at the membership meeting, do you? [Appellant's counsel]: I move to strike that. [The Court]: Sustained.

Q. At these membership meetings you have a lot of people who walk

There can be no doubt that respondent's counsel, by this means, was successful in presenting the jury with a picture of appellant as a ruthless union dictator who employed strong-

around that are big and husky and who stand in the aisles when people start to talk, don't you? [Appellant's counsel]: I object to that as being immaterial. [The Court]: Sustained. [Respondent's counsel]: Withdraw the question. Q. Do you have a gentleman by the name of Eddie Nugent down there? A. We have a building superintendent by the name of Tommy Nugent . . . . Q. A big husky guy? A. He is about your size. Q. A little heavier? A. Well, about the same weight, I guess. Q. Does he have a habit of slugging people who disagree with you? [Appellant's counsel]: I object again. [The Court]: Sustained.''

''Q. Now, you get up there, and you give your report to the membership; is that right? A. First we elect a chairman from the floor to run the meeting. . . . Q. Now, Mr. Turner, the members then approve your report, is that right? A. Sometimes. Sometimes they don't approve of all of it. Q. But then you rewrite the report, and you add a few things to it when you put it through, don't you, later on? A. I didn't understand your question. Q. I say, after you have made this alleged report to the members and they vote to approve it, sometimes you change those reports for the benefit of the organization, don't you? [Appellant's counsel]: I am going to object to that as being incompetent, irrelevant, and immaterial. If he has some specific incident—[The Court]: Well, it is immaterial. [Respondent's counsel]: I understand it is a general practice. [The Court]: We are not interested in what you understand. Q. Is that true, Mr. Turner? [Appellant's counsel]: The objection was sustained. [The Court]: There is no question pending.''

''Q. You have a reputation for slugging people when there are no witnesses and claiming they are drunk, don't you? [Appellant's counsel]: I object and ask that the jury be cautioned. [The Court]: Sustained. Q. Do you have a reputation for hitting old men, particularly an old man by the name of Willowby? [Appellant's counsel]: Same objection. [The Court]: Sustained. Q. Do you have a man named Willowby in the union? A. Yes. Q. Did he quit after being in a fight with you? [Appellant's counsel]: I object. [The Court]: Sustained. Q. You were alone in the room with Mr. Willowby, and you hit him—[The Court]: Mr. Cohn, we are trying an assault case here involving Mr. Balistreri and no one else, and I think if we try that, that is sufficient for our purposes here.''

''Q. Now, Mr. Turner, truthfully, you run that union with an iron hand; isn't that right? [Appellant's counsel]: I object to that. First of all, the word 'truthfully'—the witness is under oath. [The Court]: Sustained. Q. You do run the union with an iron hand? [Appellant's counsel]: I object to that, whether he does or doesn't. [The Court]: It calls for an opinion and conclusion. Sustained. Q. Mr. Turner, you designate what happens in that union at all times, don't you? [Appellant's counsel]: Same objection. [The Court]: I don't understand the question. Perhaps the witness does. [Respondent's counsel]: I am sorry. Q. Mr. Turner, did you ever shoot up the union hall at one time with a gun? [Appellant's counsel]: I object to it as incompetent, irrelevant, and immaterial. It has nothing to do with November 17, 1960. [The Court]: Sustained.''

arm tactics to discourage discussion during union meetings, who altered reports after they had been approved by the union members, who assaulted old men when there were no witnesses about, and who discharged firearms in the union hall. In *Fortner* v. *Bruhn* (1963) 217 Cal.App.2d 184, 188 [31 Cal.Rptr. 503], the court stated, "While a wide latitude should be given in cross-examinations, counsel, in putting questions to the witness, should not be allowed to assume facts not in evidence and state as positive assertions facts which if true, would be detrimental to the opposing party's case and of such a nature as to inflame and prejudice the minds of the jurors. . . . The inherent vice of the matter lies in the attempt to bring before the jury, in a roundabout way, facts which could not be proved and which from all appearances may have been entirely false."

Respondent does not seriously dispute the impropriety of the questions we have noted. He does assert, however, that appellant is precluded from urging such error on appeal by virtue of his failure to assign each and every instance as misconduct and to request that the jury be instructed to disregard it. We are not persuaded by this argument. In *People* v. *Wells* (1893) 100 Cal. 459, 462-463 [34 P. 1078], the court pointed out that where counsel asks questions which he knows to be inadmissible and improper without the expectation of answers and with the clear purpose of prejudicing the jury against the defendant, the harm lies in the mere asking of the questions and the judgment must be reversed unless it appears that the questions could not have influenced the verdict. In *Dastagir* v. *Dastagir* (1952) 109 Cal.App.2d 809 [241 P.2d 656], the court held the asking of such improper questions to constitute reversible error despite the fact that appellant's counsel failed to object to the questions. In so holding, the court stated, "Unless the court promptly strikes out an improper question and rebukes counsel for asking it the damage is done. If opposing counsel objects and his objection is sustained the jury may well speculate on what the answer would have been. If no objection is made the witness' denial still leaves the damaging implication or inference of the question in the record. In such circumstances for opposing counsel to object is generally more damaging than to permit it to be answered without an objection." (P. 819)

In the present case, appellant's continual objections, all of which were sustained by the court, were unavailing to deter respondent's counsel even momentarily from his ap-

parent purpose of discrediting appellant in the eyes of the jurors and thereby trying him rather than the issues properly before the court. (See *Dastagir* v. *Dastagir, supra,* at p. 816.) Under such circumstances, the judgment must be reversed and it therefore is unnecessary to discuss appellant's other assignments of error. Although the evidence, as above noted, was sufficient to support the judgment for respondent, the case was a close one, and it clearly cannot be said that the improper questions propounded by respondent's counsel could not have influenced the verdict.

Judgment reversed.

Agee, J., and Taylor, J., concurred.

A petition for a rehearing was denied May 29, 1964, and respondent's petition for a hearing by the Supreme Court was denied July 8, 1964. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.