[Civ. No. 23575. First Dist., Div. One. Feb. 28, 1968.]

EDWARD HSU et al., Plaintiffs and Appellants, v. MT. ZION HOSPITAL et al., Defendants and Respondents.

Edward Hsu and Lily Hsu, in pro. per., and Van Pinney for Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, and Patrick R. Kelly, Deputy City Attorney, Clark, Heafey & Martin, Chris G. Gasparich, John D. St. Clair, Edward J. McFetridge, Hauerken, St. Clair, Zappettini & Hines, Bledsoe, Smith, Cathcart, Johnson & Rogers and Robert A. Seligson for Defendants and Respondents.

MOLINARI, P. J.—Plaintiffs appeal from the judgment of dismissal in favor of defendants following special jury verdicts.

### Statement of the Case

On September 7, 1960, plaintiffs Edward and Lily Hsu, husband and wife, filed the instant action against defendants

Mt. Zion hospital, Dr. Robert Reiss, Richard R. Angotti, and City and County of San Francisco. The complaint seeks damages for malpractice, false imprisonment, and assault and battery. The cause of action alleged is based on an incident that took place on July 13, 1957, when, as alleged by plaintiffs, Mr. Hsu was removed from Mt. Zion Hospital by force and violence and taken to the San Francisco City and County Hospital (hereinafter referred to as San Francisco Hospital) against his will, and Mrs. Hsu, who was present at the time, was assaulted and battered, resulting in her becoming insane. Plaintiffs alleged that the one-year statute of limitations (Code Civ. Proc., § 340, subd. 3) did not bar the action because Mrs. Hsu was insane from July 13, 1957 to October 16, 1959 and the time of such disability was not a part of the time limited for the commencement of the action (Code Civ. Proc., § 352, subd. 2), and further alleged that defendants prevented Mr. Hsu from discovering the facts forming the basis of his claim until Mrs. Hsu regained her sanity and informed him of these facts.

The cause proceeded to trial by jury solely on the severed issue of the statute of limitations. In two special verdicts, the jury found the following facts: that Mrs. Hsu was insane on July 13, 1957; that she became sane for some period of time prior to September 7, 1959; that during the months of March, April and May of 1959, she was capable of caring for her property, transacting business, or understanding the nature and effect of her acts; and that Mrs. Hsu first learned of the alleged tortious conduct of each defendant prior to September 7, 1959. The jury further rendered a general verdict to the effect that the causes of action of both Mr. and Mrs. Hsu were barred by the statute of limitations.[1]

Plaintiffs make numerous contentions. Basically, they claim the following: First, Mrs. Hsu's commitment to Napa State Hospital on July 30, 1957, conclusively establishes her insanity for purposes of the statute of limitations until her official discharge on October 16, 1959; hence, the jury's verdict against her is contrary to law. Second, errors in the instructions and in the admission of evidence resulted in a miscarriage of justice. Third, counsel for defendants committed prejudicial misconduct. Fourth, the court selected an unfit

---

[1] With respect to Mrs. Hsu the verdict was as to all defendants; as to Mr. Hsu it did not include defendant Angotti, because Mr. Hsu's action against said defendant had been previously dismissed following an order sustaining a demurrer without leave to amend. No appeal was taken from the judgment of dismissal.

interpreter. Fifth, defendant Reiss was guilty of fraudulent concealment which bars him from relying on the defense of the statute of limitations.

## Facts

On July 12, 1957, Mr. Hsu was admitted to Mt. Zion Hospital by his physician, Dr. Reiss, for treatment for a collapsed lung. Following a surgical procedure for correction of this condition, it was determined that he was suffering from active tuberculosis. On July 13, 1957, Dr. Reiss ordered that he be transferred to San Francisco Hospital. Upon the arrival of an ambulance for the transfer, Mr. Hsu became unmanageable, screamed for help, and would not go. Mrs. Hsu, who had been very belligerent, loud and hysterical most of the day, lay in the corridor kicking her legs and screaming that she was back in Communist China. Police officers were summoned and they assisted in removing both plaintiffs from the hospital. Mr. Hsu was forcibly subdued and taken to San Francisco Hospital. Mrs. Hsu, who was in a hysterical condition, had to be handcuffed and carried out of the hospital. Thereafter, on July 30, 1957, Mrs. Hsu was committed to Napa State Hospital pursuant to commitment proceedings under former Welfare and Institutions Code, secton 5100 et seq. (now § 5550 et seq.).[2]

Mrs. Hsu's testimony[3] with respect to the events of July 13, 1957 was that policemen and hospital attendants pushed her to the floor, sat on her stomach, banged her head on the floor, and twisted her husband's arm and handcuffed him. She was, she claimed, trying to protect her husband from the attendants, because she thought they were about to rip off his oxygen mask and because she did not wish him to be moved to San Francisco Hospital. She further testified that the foregoing experience and the violent beating caused her to have an immediate mental derangement.

Mr. Hsu gave substantially the same account as his wife, in testimony indicating detailed specific recollecton of what he believed to be the events of July 13, 1957. He also testified that Dr. Reiss advised him to be transferred to San Francisco Hospital in order to save money, but that he and his wife asserted that they had sufficient money to pay for treatment at Mt. Zion and that he did not wish to be moved to San

[2]Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

[3]This testimony was adduced by way of deposition since Mrs. Hsu became too hysterical to testify at the trial.

Francisco Hospital, which he considered little better than a garbage can or a jail.

On December 3, 1957, Mrs. Hsu was released from Napa State Hospital on an indefinite leave of absence. She had a relapse and was returned to the hospital on October 15, 1958, as acutely disturbed and obviously psychotic. The staff notes on her progress after that date indicate that she became aggressive and destructive soon after admission but responded to shock therapy. Her husband continually visited her, which agitated and upset her, and he insisted constantly that she be released. On January 4, 1959, Mr. Hsu wrote a letter to the Napa State Hospital staff to the effect that his wife appeared "normal, serene and competent" and that her psychiatrist said that she did not need to be hospitalized. He requested her discharge. Mrs. Hsu was released on an indefinite leave of absence on January 5, 1959, as "the most practical solution to this difficult problem."

The following month the Hsus moved to a 16-unit apartment building owned by them. In March 1959, Mr. Hsu was committed to Napa State Hospital where he remained until the end of May 1959. During this time Mrs. Hsu maintained herself in the apartment house, collected rents and kept records of the payments. In April of 1959, the staff at Napa State Hospital decided that Mrs. Hsu was capable of taking care of her two children (Lillian, age 11, and Edward, Jr., age 12), who had been in a foster home, and the children were released into her custody. The staff opinion was to the effect that Mrs. Hsu was capable of taking care of her children so long as her husband was not in the household.

Field social service reports during Mrs. Hsu's leave indicated that she was making a satisfactory adjustment although "still demonstrating some unusual mental symptoms." On October 13, 1959, a staff conference at Napa State Hospital took place. It appeared that Mrs. Hsu was planning to take out citizenship papers and needed a discharge. The staff concluded that there was no evidence of psychosis at that time and recommended discharge. On October 16, 1959, Mrs. Hsu received a formal discharge release.[4]

---

[4]Section 6729 then provided, in pertinent part, that "When any person released from a state hospital is, in the opinion of the superintendent, capable of taking care of himself and his property, a certificate of competency may be issued. . . . If no guardian has been appointed for such person as provided by the Probate Code, such certificate, when filed with the clerk of the court, shall have the same legal force and effect as a judgment of restoration to capacity made under the provisions of the Probate Code."

Mr. Hsu testified substantially to the same effect as Mrs. Hsu concerning the events of July 13, 1957. However, he stated that he first discovered his wrongs at defendants' hands around November or December of 1959 when as a result of a conversation with a friend from Formosa he was led to elicit further material facts from his wife and deduced that he had been wronged. He also stated that before he was able to talk with his wife he thought that their removal from Mt. Zion Hospital might have been occasioned by her refusal to pay a bill there, but that he subsequently ascertained in November of 1959 that such was not the case. Further, Mr. Hsu testified that Dr. Reiss visited him in the ward of San Francisco Hospital around October 10 or 11, 1957, and that he asked the doctor what had happened at Mt. Zion and mentioned that two ambulance men and one policeman had handcuffed him and dragged him out. To this assertion Dr. Reiss allegedly responded that whatever had happened to Mr. Hsu was done for his own good. On the stand, Dr. Reiss denied having discussed the events of July 13 with Mr. Hsu, stated that he visited the patient very briefly, and that Mr. Hsu had asked that he get him out of San Francisco Hospital.

## Mrs. Hsu's Insanity

Mrs. Hsu's commitment on July 30, 1957 was made pursuant to section 5100 providing, as it then read, for the adjudication of a person as mentally ill and the commitment of that person if the committing judge believed that said person were either "of such mental condition that he is in need of supervision, treatment, care, or restraint," or "of such mental condition that he is dangerous to himself or to the person or property of others, and is in need of supervision, treatment, care or restraint, . . ." Plaintiff argues that this commitment conclusively established her insanity for purposes of the statute of limitations (Code Civ. Proc., § 352, subd. 3) up until her formal discharge on October 16, 1959. This contention is without merit.

As used in Code of Civil Procedure section 352, subdivision 2, the term "insane" has been defined as a condition of mental derangement which renders the sufferer incapable of caring for his property or transacting business, or understanding the nature or effects of his acts. (*Pearl* v. *Pearl*, 177 Cal. 303, 307 [177 P. 845]; *Gottesman* v. *Simon*, 169 Cal.App.2d 494, 498-499 [337 P.2d 906]; *Wade* v. *Busby*, 66 Cal.App.2d 700, 703 [152 P.2d 754].) This defini-

tion may include within its meaning a person who has been adjudicated mentally ill pursuant to the provisions of the Welfare and Institutions Code, but such adjudication is not a conclusive judicial determination that he is an insane person. (*Fetterley* v. *Randall,* 92 Cal.App. 411, 413 [268 P. 434]; *Guardianship of Carniglia,* 139 Cal.App. 629, 631 [34 P.2d 752]; *People* v. *Field,* 108 Cal.App.2d 496, 500 [238 P.2d 1052]; *People* v. *Prosser,* 56 Cal.App. 454, 458-459 [205 P. 869]; *Kellogg* v. *Cochran,* 87 Cal. 192, 198 [25 P. 677, 12 L.R.A. 104]; *Carroll* v. *Carroll,* 16 Cal.2d 761, 766 [108 P.2d 420]; *In re Zanetti,* 34 Cal.2d 136, 143 [208 P.2d 657]; see *People* v. *Willard,* 150 Cal. 543, 548-549 [89 P. 124]; see also Weihofen, *Mental Incompetency to Contract or Convey* (1966) 39 So.Cal.L.Rev. 211, 222, fn. 49.) Such a person is presumed to be insane, but the presumption is rebuttable. Since this case was tried before January 1, 1967, the effective date of the new Evidence Code, we need not discuss whether the rebuttable presumption is one affecting the burden of producing evidence or one affecting the burden of proof (Evid. Code, §§ 601, 603, 604, 605, 606) but we consider it in the light of existing law which declared that such a presumption is evidence that must be weighed against conflicting evidence. (See *Smellie* v. *Southern Pac. Co.,* 212 Cal. 540, 549-555 [299 P. 529]; *Scott* v. *Burke,* 39 Cal.2d 388, 394-395 [247 P.2d 313]; *People* v. *Stevenson,* 58 Cal.2d 794, 796 [26 Cal.Rptr. 297, 376 P.2d 297].)

The rationale underlying the cases that hold that an adjudication of mental illness arising out of a commitment proceeding is not conclusive evidence of insanity is that the purpose of such a proceeding is not to determine whether such a person is incapable of caring for his property or transacting business or understanding the nature or effects of his acts, but rather to determine whether the person is in fact in such a mental condition as to justify the state in depriving him of his personal liberty and affording him, if it is found needed, the benefit of proper care and remedial aid. (*In re Zanetti, supra,* 34 Cal.2d at p. 143; *Fetterley* v. *Randall, supra,* 92 Cal.App. at p. 413; *Kellogg* v. *Cochran, supra,* 87 Cal. at pp. 196-197.) ■ As stated in *Zanetti,* "The proceedings pursuant to the Welfare and Institutions Code . . . contemplate determination of the question whether the person is so mentally ill or deranged as to be *dangerous* to himself or others and, in order to protect society, a proper subject for commitment to the state hospital." (P. 143.) In *Zanetti,* moreover, there is a clear indication that a person who is

adjudged mentally ill and in need of hospital treatment under the Welfare and Institutions Code may nevertheless be capable of transacting business and carrying out his affairs, either during occasional lucid intervals or throughout his hospitalization. (See Weihofen, *supra*, at p. 221.)

Plaintiffs place strong reliance on *Gottesman* v. *Simon*, *supra*, 169 Cal.App.2d 494, which holds that an adjudication of insanity in guardianship proceedings (Prob. Code, §§ 1460-1472) conclusively establishes insanity so as to toll the statute of limitations until the ward's restoration to capacity, absent an affirmative showing of abusive use of the guardianship proceedings. The opinion states that ''a judicial determination fixing the status of incompetency prevails until such time as the incompetent is restored to capacity or the guardianship has been substantially abandoned.'' (P. 501.) (See also *Hellman Commercial T. & S. Bank* v. *Alden*, 206 Cal. 592, 604-605 [275 P. 794].) This case is readily distinguishable because it deals with a guardianship proceeding under the Probate Code and not a commitment proceeding under the Welfare and Institutions Code. This distinction has been clearly recognized by the decisions. (See *In re Zanetti*, *supra*, 34 Cal.2d at p. 143; *Kellogg* v. *Cochran*, *supra*, 87 Cal. at pp. 197, 199; *Knorp* v. *Board of Police Comrs.*, 31 Cal.App. 539, 541 [161 P. 12].) ■ Where a guardian is appointed the adjudication of insanity is conclusive against all persons dealing with the ward until he is restored to capacity by order of court. (*Kellogg* v. *Cochran*, *supra*, at pp. 195-196; see Weihofen, *supra*, at p. 212.) The rationale underlying this rule is that the proceedings pursuant to the provisions of the Probate Code are primarily designed to protect an incompetent who is for any reason incapable of taking care of himself and of his property. (*In re Zanetti*, *supra*, at p. 143.) As stated in *Zanetti*, ''Protection of the incompetent from others is the main purpose of the statute.'' It has also been stated that California cases have treated adjudications of insanity in guardianship proceedings as conclusive because it is desirable to permit the guardian to act effectively by giving certainty to his dealings with the ward's property. (Weihofen, *supra*, at p. 212; see *Kellogg* v. *Cochran*, *supra*, at pp. 195-197.)[5]

---

[5] We note, moreover, that even in the guardianship cases the presumption is applied only to contracts and conveyances and not to wills, marriage or ''other legal acts.'' (See *Estate of Johnson*, 200 Cal. 299, 303-305 [252 P. 1049]; *Estate of Worrall*, 53 Cal.App.2d 243 [127 P.2d 593]; *Estate of Karau*, 26 Cal.App.2d 606 [80 P.2d 108]; Civ. Code, § 40; and see Weihofen, *supra*, at p. 213.) We note, moreover, that the

 In light of the foregoing, Mrs. Hsu's commitment to Napa State Hospital did not conclusively determine her insanity so as to toll the statute of limitations. Rather, her commitment raised a rebuttable presumption of insanity, which presumption defendants were entitled to and did controvert with evidence that Mrs. Hsu was released from the hospital, managed a 16-unit apartment building, and took care of her two minor children during March through May 1959. This evidence supports the jury's finding that Mrs. Hsu was competent to transact business and care for her property during the months of March, April, and May 1959. The special verdict in turn supports the conclusion that the statute of limitations commenced to run against Mrs. Hsu in March 1959, or at the very latest, in May 1959, and is a bar to the instant action which was not commenced until September 7, 1960.

### The Instruction Defining Insanity

 Plaintiffs contend that the following instruction gave the jury logically inconsistent definitions of insanity and sanity:

"For these purposes, in order to find that plaintiff was insane, you must find that she was incapable of caring for her property, or transacting business or understanding the nature or effects of her acts.

"Conversely, to find that plaintiff ceased to be insane, you must find that she was capable of caring for her property, or transacting business, or understanding the nature or effects of her acts.

"The meaning of 'transacting business' includes hiring an attorney and filing a legal action."

Plaintiffs argue that under paragraph one of the instruction, the jury was told to find Mrs. Hsu insane if she suffered from any one of the three named mental deficiencies; but under paragraph two, the jury was told that she was not

---

modern trend has been to accord less weight to hospitalization as evidence of contractual incompetency. (See Weihofen, *supra,* at pp. 221-222 where it is noted that in the Draft Act Governing Hospitalization of the Mentally Ill it is specifically provided that every patient in a mental hospital retains his civil rights, including the right to contract.) We specifically note that section 5005 of the California Mental Health Act of 1967 (Welf. & Inst. Code, §§ 5000-5401), which will become operative upon the 61st day after the final adjournment of the 1968 Regular Session of the Legislature, provides that "Unless specifically stated, a person complained against in any petition or proceeding initiated by virtue of the provisions of this part shall not forfeit any legal right or suffer legal disability by reason of the provisions of this part."

insane if any one of these same three deficiencies ceased to exist.

The first paragraph of the instruction is taken directly from *Pearl* v. *Pearl, supra,* 177 Cal. at page 307 and is a definition of insanity recognized by the decisions. (See also *Wade* v. *Busby, supra,* 66 Cal.App.2d at p. 703; *Gottesman* v. *Simon, supra,* 169 Cal.App.2d at pp. 498-499.) The second paragraph, although purporting to be a definition of sanity by stating the converse of the first paragraph, is logically inconsistent with the first paragraph. Thus, under the instruction Mrs. Hsu would cease to be insane if she became capable of "transacting business" even though she could neither care for her property nor understand the nature and effects of her acts. The second paragraph was, therefore, confusing and should not have been given.

In the context of all the instructions, however, we do not find this error sufficiently prejudicial to warrant reversal. The cases cited above, such as *Pearl* and *Wade,* although using the language of the first paragraph of the instruction to define insanity, do not purport to hold that this language is the sole definition of insanity or that the three conditions there set forth are the exclusive tests of mental incompetence for purposes of tolling the statute of limitations. As we understand these cases, the basic question to be resolved by the jury is whether the allegedly insane plaintiff is sufficiently aware of the nature or effects of his acts to be able to comprehend such business transactions as the hiring of an attorney and the instigation of a legal action. If he is so aware, then the statute will begin to run against him. We believe that the instructions given by the court in this case, which followed the foregoing instruction and which we set out in the margin,[6] adequately conveyed this point to the jury. The cases relied on by plaintiff (*Crowther* v. *Rowlandson,* 27 Cal. 376, 381; *Pomeroy* v. *Collins,* 198 Cal. 46, 69 [243 P. 657]) do not hold to the

---

[6]These instructions charged as follows:

"The term 'insane' has been given a generic, rather than technical meaning, and means such a condition of mental derangement as actually to bar the sufferer from comprehending rights which he or she is bound otherwise to know."

"You are instructed that a person is insane if he is incapable of understanding the nature or effects of his acts, or is in such a condition of mental derangement that actually bars such person from comprehending rights which he otherwise is bound to know."

"You are instructed that if a person is incompetent by reason of his mental condition that this is equivalent to insanity and the Statute of Limitations does not begin to run until such person is capable of discovering the circumstances upon which his action is based."

contrary, and in fact support our interpretation that the essential question is the plaintiff's ability to understand the transaction at hand.

## The Instruction on the Statute of Limitations

■ Plaintiffs claim that giving the following instruction constituted reversible error: ''You are instructed that statutes of limitations are favored in the law as tending to promote desired social ends—that is, as affording repose from stale claims to defendants who may have lost the means of procuring evidence, thus giving security and stability to human affairs.

''The defense of the statute of limitations is regarded as a meritorious defense.''

No case that we have been able to discover or that has been cited on this appeal condones or even discusses giving an instruction such as this one. Defendants cite numerous cases containing the above language; however, these cases were not formulating jury instructions but rather were articulating policy considerations relevant to particular issues. (See *Schriber* v. *Alameda etc. Title Ins. Co.*, 156 Cal.App.2d 700, 708 [320 P.2d 82], and *Hopkins* v. *Hopkins,* 116 Cal.App.2d 174, 179 [253 P.2d 723] (refusal to permit amendment pleading statute of limitations); *Kunstman* v. *Mirizzi,* 234 Cal.App.2d 753, 757 [44 Cal.Rptr. 707] (estoppel to assert statute); and see *Scheas* v. *Robertson,* 38 Cal.2d 119, 125-126 [238 P.2d 982]; *Shain* v. *Sresovich,* 104 Cal. 402, 406 [38 P. 51]; *Lilly-Brackett Co.* v. *Sonnemann,* 157 Cal. 192, 196-197 [106 P. 715, 21 Ann.Cas. 1279]; *People* v. *Universal Film Exchanges, Inc.,* 34 Cal.2d 649, 659 [213 P.2d 697]; and *Neff* v. *New York Life Ins. Co.,* 30 Cal.2d 165, 169 [180 P.2d 900, 171 A.L.R. 563], which have nothing to do with jury instructions.)

We agree with plaintiffs that the foregoing instruction should not have been given, because it intimates that the defense of the statute of limitations is peculiarly favored over other defenses that may arise in actions of this type, and there is no authority for such a proposition. Such an instruction, given without qualification, could easily mislead the jury to believe that they should show special partiality to the party relying on the statute of limitations. In this case, however, we do not think that it is reasonably probable that the jury was misled in this respect, since the court also instructed the jury that the court did not intend in any of its instructions to express any opinions as to the weight of the evidence, the credibility of the testimony of any witness, or the establish-

ment of any fact. The jury was also cautioned not to select a single instruction, and not to be influenced by sympathy, prejudice or emotion in favor of or against any party.

*Alleged Error With Respect to Other Instructions*

■ Plaintiffs contend it was error to refuse to give their requested instruction defining "lucid interval." There was no need for such an instruction. As we have already pointed out, the jury was adequately instructed on the meaning of insanity and was made aware that the statute of limitations would only begin to run against Mrs. Hsu when she returned to sanity.

■ The instruction requested by plaintiffs that if insanity occurs simultaneously with or shortly after the wrongful act, the statute of limitations does not commence to run until the disability is removed, although a correct statement of the law (*Weinstock* v. *Eissler*, 224 Cal.App.2d 212, 231 [36 Cal.Rptr. 537]), was properly omitted. Defendants' instruction No. A-5 stating Mrs. Hsu's contention as to the applicability of the statute of limitations, which the court gave and which we set out in the margin,[7] in the context of other instructions, adequately informed the jury that Mrs. Hsu could avoid the statute by showing that she became insane following the alleged tortious conduct and remained in that condition until after September 7, 1959. Further, failure to give this instruction could not have been prejudicial because the jury found Mrs. Hsu to be insane on the date of the alleged wrongful acts. We note that although the instructions on this topic might have been more precise, they were not seriously defective so as to confuse the jury as to the applicable law.[8]

■ Plaintiffs also claim that it was error to give defendants' instruction No. A-5, *supra,* stating plaintiffs' contention, because it misstates their position, which was that

---

[7]This instruction charged as follows:

"In this case, plaintiff Lily Hsu contends that the one-year Statute of Limitations does not apply because she was insane following the alleged act or acts of July 13, 1957, and that this insanity was continuous until after September 7, 1959, that is, until one year before her action was filed."

[8]The pertinent instructions are as follows: "Section 352 of the same code [Code Civ. Proc.] provides in part as follows: 'If a person entitled to bring an action . . . be, at the time the cause of action accrued . . . Insane . . . the time of such disability is not a part of the time limited for the commencement of the action.' "

"You are instructed, that where mental incapacity exists at the time the cause of action accrues, the Statute of Limitations of this jurisdiction provide that an action need not be maintained thereon until one year after removal of the disability."

defendants' acts rendered Mrs. Hsu *immediately* insane. We perceive no misstatement in the use of the language "following the alleged act or acts of July 13, 1957" and the failure to use the word "immediately" instead of the word "following." Moreover, in view of the jury's finding that Mrs. Hsu was insane on said date, no possible prejudice appears. Plaintiffs further claim that this instruction does not refer to the date of Mrs. Hsu's formal discharge and therefore "artfully avoids" the significance of this date. As we have pointed out, the date of formal discharge is not controlling; the question is whether Mrs. Hsu regained her sanity at any time before September 7, 1959, and the instruction is framed along these lines.

As to plaintiffs' contention that it was error to give defendants' instruction stating that Mrs. Hsu's commitment is not conclusive evidence of insanity, we hold that such instruction was not erroneous because it correctly stated the applicable law for the reasons already stated in the discussion of plaintiffs' first contention.

### Alleged Errors in the Admission of Evidence

Both plaintiffs and defendants introduced a great deal of medical records evidence pertaining to both Mr. and Mrs. Hsu. At trial plaintiffs objected to some of this evidence coming in and moved to have it stricken as hearsay. The trial court denied a general motion to strike on the ground that it was not specific enough and came too late. The court similarly denied other objections. Plaintiffs now claim that much of the medical records evidence introduced against them was inadmissible hearsay and was highly prejudicial, tending to reveal that Mr. Hsu was psychotic and paranoid and otherwise reflecting on his character.[9]

We see no purpose to be served by detailing the evidence to which plaintiffs object, for the following reasons: To begin with, much of this evidence was admissible under exceptions to the hearsay rule, either tending to show Mr. Hsu's state of mind, which is relevant to the question of the circumstances

---

[9]For example, they cite the following comments about Mr. Hsu that were read into evidence: "Husband: obstreperous, uncooperative, demanding her release (he may be paranoid)"; "strong paranoid tendencies"; "blatantly paranoid"; "chain smoking, garrulous husband"; "husband is a disturbed, uncooperative, paranoid character." Plaintiffs cite numerous other examples, including a report from the Napa State Hospital medical records pertaining to Mr. Hsu to the effect that all San Francisco public welfare agencies had "agreed that Mr. Hsu had been so much trouble that they would form a concerted action and follow through as far as was necessary in the circumstances."

under which he discovered the facts underlying his cause of action, or constituting business records.[10] With respect to business records plaintiffs specifically waived the foundation requirement, as to such items as were not relevant or were inadmissible, plaintiffs failed to make timely specific objections even though the court explicitly requested specific objections. Under these circumstances, the trial court did not err in refusing to grant the motions to strike. In view of the large quantity of medical records introduced, there would have been an enormous burden on the court if it had had to go through these records line by line to decide which portions were properly admissible. This duty properly rested on counsel. (See *Walls* v. *Macy's,* 226 Cal.App.2d 29, 30-31 [37 Cal.Rptr. 745].)

 Moreover, the record discloses that plaintiffs themselves introduced a great deal of medical records evidence that tended to reveal that Mr. Hsu was "belligerent," "paranoid," prone to engage in lawsuits, uncooperative, and dogmatic. In light of this voluminous evidence, plaintiffs' contention that Mr. Hsu could have been prejudiced by the inadmissible items of defendants' evidence is tenuous. Further, since plaintiffs themselves offered a great deal of evidence on Mr. Hsu's mental state at the time of the alleged wrongs, there is no question but that defendants were entitled to refute this evidence by insisting that the relevant portions of the records be read in full. As to Mrs. Hsu, we perceive no prejudice to her by the admission of the challenged evidence. None of the evidence complained of tended to show in any way that she was not insane during the relevant period of time, nor did it reflect on her character or otherwise adversely affect her case.

### Conduct of Counsel

At one point in the trial Mr. Bronson, counsel for defendant Reiss, asked Mr. Hsu, "You know from your study of it that the outstanding thing about paranoia is an obsession of persecution by others, isn't that true?" An objection to this question was sustained. Later on Mr. Bronson asked, "You felt she was persecuting you, didn't you, in that regard?" to

---

[10]See, e.g., *Phillips* v. *G. L. Truman Excavation Co.,* 55 Cal.2d 801, 810 [13 Cal.Rptr. 401, 362 P.2d 33]; *Dussault* v. *Condon,* 170 Cal.App.2d 693, 696 [339 P.2d 896]; *Johnson* v. *Nicholson,* 159 Cal.App.2d 395, 411 [324 P.2d 307]; *People* v. *Brust,* 47 Cal.2d 776, 785 [306 P.2d 480]; *Larson* v. *Solbakken,* 221 Cal.App.2d 410, 418 [34 Cal.Rptr. 450]; *People* v. *Gorgol,* 122 Cal.App.2d 281, 299-300 [265 P.2d 69].

which an objection was again sustained. Mr. Bronson then asked, "Did you feel that the San Francisco City and County Hospital people, when you were there, were detaining you just as a matter of persecution to you?" to which an objection was sustained once more. Finally, Mr. Bronson asked, "Did you think that Dr. Reiss was persecuting you in the conduct that you complain of on his part?" Once again, an objection was sustained and the court admonished the jury to disregard the foregoing questions. Plaintiffs complain that these improper questions, along with the various items of hearsay evidence discussed under the immediately preceding topic, tended to disparage Mr. Hsu as a paranoid person and were plainly prejudicial to him in this respect. Although there was no motion for a mistrial made at the trial, plaintiffs, citing *Balistreri* v. *Turner,* 227 Cal.App.2d 236, 244 [38 Cal.Rptr. 553]; *Gee* v. *Fong Poy,* 88 Cal.App. 627, 638 [264 P. 564]; *Stevenson* v. *Link,* 128 Cal.App.2d 564, 574 [275 P.2d 782]; and *Dastagir* v. *Dastagir,* 109 Cal.App.2d 809, 816 [211 P.2d 656], claim that counsel's misconduct was so overt and intentional as to be prejudicial per se.

We do not think that the cases relied upon by plaintiffs control this case. In those cases the conduct of counsel was blatantly prejudicial, damaging, and detrimental to the opposing party's case and of such a nature as to inflame and prejudice the minds of the jurors. In this case, on the other hand, the questions complained of brought no new facts before the jury. As pointed out, plaintiffs' own evidence contained material tending to show that Mr. Hsu was both paranoid and litigious. Further, as previously noted, Mr. Hsu's state of mind at and after the time his cause of action arose is relevant to the question of the circumstances under which he discovered such cause of action to exist. Therefore, although the questions complained of were improper for various reasons, and properly stricken on objection, they were not so clearly irrelevant to the cause at issue as to compel the conclusion that counsel deliberately was attempting to prejudice plaintiff by introducing extraneous matter. We think it possible to conclude that the foregoing questions were asked in good faith to test the credibility of Mr. Hsu as to his knowledge of the facts constituting his cause of action and also as to the circumstance whether Dr. Reiss fraudulently concealed anything from Mr. Hsu.

Plaintiffs also cite other questions put by defense counsel, to which objections were sustained, as prejudicial misconduct.

There is no merit in plaintiffs' contention in this regard. None of these questions placed damaging extrinsic facts before the jury, none of them were evidence of patent misconduct, and none of them occurred in the context of a series of questions put in disregard of court rulings, such as was the case in *Balistreri* v. *Turner, supra,* 227 Cal.App.2d at p. 244.[11]

### *The Interpreter*

Plaintiffs next assert that the court abused its discretion in selecting an interpreter who allegedly could not speak Mandarin as well as the interpreter of plaintiffs' choice and who was not acceptable to Mrs. Hsu. The facts developed as follows: During the initial proceedings to select an interpreter through whom Mrs. Hsu would testify, plaintiffs' counsel stated that plaintiffs had an interpreter, a Berlitz schoolmaster, who spoke better Mandarin than the court interpreter, and that plaintiffs would pay for the services of this preferred interpreter. Plaintiffs also claimed that the court interpreter had been occasionally employed by the City of San Francisco and might therefore be prejudiced. The court responded that it preferred the court interpreter because Berlitz people talk back and forth with the witness and don't translate everything for the court, such as nonresponsive answers. The court concluded that the court interpreter is trained to be impartial and versed in courtroom procedures and hence is to be preferred.

The case went to trial. When Mrs. Hsu was first called as a witness, she testified through the court interpreter, Mr. Yu, during the first morning session. When trial resumed in the afternoon, she attempted to say something to the court, which the court would not permit since the statement was volunteered. Mrs. Hsu continued to try to volunteer information and said that she wanted a different interpreter. The court said that if she refused to proceed with the court interpreter it would declare a mistrial. While the court was explaining these matters to Mrs. Hsu, she became hysterical, threw a book

---

[11]In connection with the circumstances under which plaintiffs obtained Mrs. Hsu's discharge from Napa State Hospital, defense counsel asked: "Did you also consider that you and your wife or both of you were committing a fraud on the Federal Government?" Later, defense counsel misquoted a prior piece of evidence which said that Mr. Hsu was a "chain smoking, garrulous husband," stating instead that Mr. Hsu was a "claims making garrulous husband." Finally, the last question complained of is "In the family the husband is the man that dominates the family and makes the decisions, isn't that true?" asked with reference to Chinese customs.

on the floor, began screaming, and stamped out of the courtroom. Subsequently, plaintiffs' desired interpreter, Mr. Chang, took the stand to clear up some alleged problems with Mrs. Hsu's testimony through Mr. Yu. However, it was not possible to put Mrs. Hsu back on the stand, as she apparently had a nervous collapse following her hysteria.

Mr. Chang, plaintiffs' preferred interpreter, sat in the courtroom throughout Mrs. Hsu's testimony. When a dispute arose concerning her testimony, it developed that the alleged mistake concerned something Mrs. Hsu had said in English. Additionally, Mr. Chang took the stand out of the jury's presence and made a few minor corrections, of minimal significance, of Mr. Yu's translation.

Plaintiffs challenged the use of Mr. Yu mainly on the ground that he would be prejudiced in favor of the city. They did not dispute his qualifications, which included the facts that he was a graduate of Massachusetts Institute of Technology and had taught Mandarin.

''The competence of the interpreter is ordinarily for the trial court to determine.'' (*People* v. *Mendes,* 35 Cal.2d 537, 543 [219 P.2d 1].) The matter of selection of an interpreter is within the discretion of the trial court. (*People* v. *Rebolledo,* 93 Cal.App.2d 261, 264 [209 P.2d 16].) Here we do not think that the court abused its discretion, nor do we perceive any prejudice in the use of Mr. Yu. The interpreter chosen by the court was clearly qualified to speak Mandarin, and the mere fact of his having been employed on occasion by one of the defendants does not automatically disqualify him, especially when plaintiffs were permitted to have their interpreter, Mr. Chang, present in the courtroom to make challenges and corrections when necessary. There is nothing in this record to indicate that Mr. Yu was in any way unfit for his duties. Further, although plaintiffs now claim that Mrs. Hsu's breakdown was occasioned by the use of the court interpreter, it appears just as likely from the record that she lost patience with orderly courtroom procedures and flew into a passion when the judge would not permit her to volunteer statements as she pleased.

### Fraudulent Concealment

Plaintiffs' final argument is essentially a contention that the verdict and judgment in favor of defendant Dr. Reiss is contrary to law because Dr. Reiss is guilty of fraudulent concealment so as to toll the statute of lmitations on plaintiffs' causes of action. The instructions to the jury on this

subject were entirely proper, as plaintiffs concede. Plaintiffs are therefore arguing that the evidence does not support the verdict.

This contention has no merit. We find no evidence whatsoever of fraudulent concealment in this record. Plaintiffs claim that Mr. Hsu was never told that he suffered from acute pneumothorax, subcutaneous emphysema, and complications of wound infection, but was merely informed that he had tuberculosis at the time of his transfer. The record does not establish this contention. Moreover, it appears that the foregoing afflictions were medical aspects of Mr. Hsu's tubercular condition, so that even assuming that Dr. Reiss had a duty to detail the nature of his disease to Mr. Hsu, it would seem that he complied with such duty. In any event, such nondisclosure, if it existed, is totally irrelevant to the question whether Dr. Reiss concealed the facts constituting Mr. Hsu's cause of action, since Mr. Hsu does not allege malpractice based on his physical condition before his transfer, but rather relies on the alleged forcible transfer to San Francisco Hospital as constituting the wrong against him.

Plaintiffs' other citations to the record simply indicate that Dr. Reiss knew that Mr. Hsu was being transferred. We fail to see how this knowledge indicates fraudulent concealment in this connection. Plaintiffs cite testimony by Mr. Hsu to the effect that Dr. Reiss denied having authorized the transfer and told Mr. Hsu to forget about it. Needless to say, said testimony by one of the plaintiffs is not conclusive upon the jury, which obviously elected to disbelieve it. In any event, in view of the fact that Mr. Hsu was himself aware of the fact of his transfer, it is difficult to conceive how Dr. Reiss' alleged statement to him months later to forget about the matter could conceivably lull Mr. Hsu into refraining from filing his case. Since Dr. Reiss was not present during the transfer, the jury was entitled to conclude that it was unlikely that he subsequently concealed from Mr. Hsu the supposed fact that Mr. Hsu had been assaulted and otherwise mistreated during said transfer.

### Conclusion

In view of the foregoing the only errors we find in the record are inconsistency appearing in one of the instructions on insanity and the giving of the instruction that the statute of limitations is favored in the law. As already indicated, we do not deem these errors prejudicial.

 As respects Mr. Hsu, we think there was clearly no miscarriage of justice by reason of the errors, since his own testimony indicated that he recalled the details of the alleged tortious acts and thus rendered incredible his contention that he was not aware of the facts giving rise to his cause of action until after discussing the matter with his wife. Although he may not have realized the *legal consequences* of these facts before discussing the matter with his friend from Formosa, such ignorance is, of course, not a basis for avoiding the statute of limitations. As to Mrs. Hsu, although the case is not as clear, we do not think it reasonably probable that a different result would have obtained had the subject instruction not been given, because the special verdict finding her sane during the months of March, April, and May of 1959 clearly rests on the evidence that she maintained herself, her children, and a 16-unit apartment building during that time. These facts, coupled with her long absence from custodial confinement before her formal discharge, constitute strong evidence of her return to sanity during that period.

 Under secton 13 of article VI of the California Constitution a judgment should not be reversed on the ground of misdirection of the jury unless the reviewing court shall be of the opinion, after an examination of the entire cause, including the evidence, that the error has resulted in a miscarriage of justice. (See *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243]; *People* v. *Hamilton,* 60 Cal.2d 105, 120 [32 Cal. Rptr. 4, 383 P.2d 412].) In the present case we have examined the entire cause and the evidence in the light of this constitutional provision and we have concluded that the errors have not resulted in a miscarriage of justice.[12]

The judgment against both plaintiffs is affirmed.

Sims, J., and Elkington, J., concurred.

A petition for a rehearing was denied March 20, 1968, and appellants' petition for a hearing by the Supreme Court was denied April 24, 1968. Peters, J., was of the opinion that the petition should be granted.

---

[12]Defendant city makes the argument in its brief that plaintiffs did not file a claim with the city within 60 days of the occurrence of the alleged tortious acts nor within a reasonable time of plaintiffs becoming able to file *said claim.* (*Former* §§ 710-715 of the Government Code, and former § 87 of the Charter of the City and County of San Francisco.) We do not discuss this contention for several reasons. Although the court

instructed the jury that a claim was required to be filed against the city within 60 days after the occurrence from which it is claimed the damages have arisen, the record does not disclose that the jury made a specific finding in this regard. Plaintiffs assert no claim of error with respect to the instruction. In any event, since the jury found that the cause of action of plaintiffs was barred by the statute of limitations as to all defendants, we need not speculate as to whether the jury did or did not deem that plaintiffs had filed a timely claim against the city.