Donald C. GOEWEY

v.

The UNITED STATES.

No. 456–73.

United States Court of Claims.

Dec. 12, 1979.

Herbert P. Suskind, Washington, D. C., attorney of record, for plaintiff.

Jean Schepers, Washington, D. C., with whom was Acting Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge Bernhardt filed on December 14, 1978. That decision was rendered pursuant to the court's order of March 14, 1975, which remanded the case to the Trial Division to determine whether plaintiff was under a legal disability, within the meaning of 28 U.S.C. § 2501, from July 16, 1965 until December 3, 1970, so that the claim in this suit, filed on December 3, 1973, is not barred by the statute of limitations. The trial judge held that the plaintiff was not under a legal disability during that period. Upon consideration of the briefs and after oral argument, the court agrees with the trial judge's conclusion, and adopts his recommended opinion and findings as the basis for its decision.[1]

We give somewhat greater weight than the trial judge apparently did to one fact. Finding 29, to which the plaintiff did not except (although he excepted to other findings), states that on May 28, 1969, the plaintiff filed an application with the Air Force Board for the Correction of Military Records to change his records to show that in 1951 he was retired for disability rather than having been honorably discharged. If plaintiff was competent to file that application, it is difficult to comprehend why at that time he was not also competent to have filed suit in this court.

At oral argument plaintiff's counsel stated that the cause of action did not arise until 1971, when the Correction Board denied plaintiff some of the relief he sought, so that his action filed in 1973 was timely. He further stated that if the court upheld the trial judge's determination that plaintiff was not under a legal disability between July 16, 1965 and December 3, 1970, then he would contend that under the foregoing theory this suit is timely. This contention rests upon a misapprehension of our order of March 14, 1975, remanding the case to the Trial Division to determine the disability issue. Implicit in the remand was the determination that unless the plaintiff was under a legal disability between 1965 and 1970, the statute of limitations bars his action. Since we now hold against the plaintiff on the disability issue, his suit is time-barred. Accordingly, the petition is dismissed with prejudice.

In our order of March 14, 1975, [206 Ct.Cl. 874] we held in abeyance plaintiff's motion to transfer to the district court his claim relating to his national service life insurance policy "pending the outcome of the proceedings on his alleged legal disability." The national service life insurance claim is governed by 38 U.S.C. § 784 (1976). Subsection (b) imposes a statute of limitations of 6 years upon such a claim and, in the case of a person under a legal disability, extends the limitations period for 3 years following removal of the disability. For the reasons stated in our discussion of plaintiff's competency, his national service life insurance claim necessarily fails. Although this court has no jurisdiction to hear the national service life insurance claim, it must consider the interests of justice in granting a transfer to the district court. 28 U.S.C. § 1506 (1976). Transfer of a claim that is barred by the statute of limitations would not serve those interests. Accordingly, plaintiff's motion to transfer the national service life insurance claim is denied.

---

1. Although we have adopted the trial judge's findings of fact, we have not printed them because, to the extent necessary to our decision, they are set forth in our opinion.

## OPINION OF TRIAL JUDGE

BERNHARDT, Trial Judge: The sole issue remanded to the trial judge by the court's order of March 14, 1975, is whether plaintiff was under a legal disability within the meaning of the third paragraph of 28 U.S.C. § 2501 from July 16, 1965 (the date of his release from St. Elizabeths Hospital) to December 3, 1970 (3 years prior to the filing of his petition). It is concluded that he was not under a legal disability during the period named for the stated purpose.

The factual background of plaintiff's long history of mental disability and criminal record of false pretenses by passing bad checks going back to his military service during 1942–51 is presented in the cross-motions for summary judgment which were dismissed by the Appellate Division. That factual background, which necessarily influences plaintiff's mental condition during his 5 post-St. Elizabeths years, will not be repeated here; familiarity with it will be supposed.

Upon his release from St. Elizabeths by District Court order of July 16, 1965, plaintiff's condition on discharge was recorded as "Recovered" and he was diagnosed as "Competent." He had been a patient there since December 3, 1959. Dr. Owens, then Clinical Director of the hospital, felt plaintiff was free of mental illness and capable of managing the ordinary affairs of life. Since then plaintiff has remained under continual psychiatric care until the trial here in May 1977.

While in St. Elizabeths plaintiff had been given occasional conditional releases to work for Hinkel and Company, a rug cleaning concern in Washington, D. C., and upon his final release in 1965 he resumed employment there.

In the summer of 1966 plaintiff was referred to the law firm of Seltzer and Suskind in Washington, D. C., in connection with a criminal charge of false pretenses for writing bad checks. In the ensuing 5 years Suskind represented plaintiff in an estimated 20 to 30 different matters. He soon learned of plaintiff's history of mental and criminal problems and of his military record. Plaintiff used Suskind's office constantly as a base of operations for telephone calls, conducting correspondence, and consulting with Suskind on his legal problems. Plaintiff, a person of superior intellect, prepared much of the voluminous paperwork generated by his various legal problems, including his monthly probation reports. He demonstrated no mental or intellectual inability to understand the nature of his legal problems and was an active participant in their handling.

Plaintiff's close association with Suskind was interrupted briefly from May 1968 to March 1969 when he became married and moved to North Carolina, but he remained in frequent communication with his attorney. In May 1968 he received some $17,000 from Veterans Administration (hereafter VA) and Social Security which, with his wife's help, was quickly dissipated along with his other income. His wife emptied his bank account after he had drawn a check in payment of a car he had purchased for her daughter, and notified plaintiff's parole officer of the violation.

Because of this parole violation charge plaintiff was returned to Washington by a U.S. Marshal in March 1969 for a hearing before Judge Bryant, who appointed Suskind as plaintiff's guardian and placed him in charge of plaintiff's funds. Plaintiff was prohibited from having a bank account or credit cards.

Upon returning to Washington plaintiff resumed his constant attendance at Suskind's office, using it as a command post for his ongoing legal activities. Through Suskind the plaintiff was appointed by a bank to collect rents in a building. In doing so plaintiff, like a modern Robin Hood, used rents collected from some tenants to pay the rents of other delinquent tenants to prevent their eviction. Plaintiff was prosecuted by the bank for embezzlement and placed on 3 years probation.

Plaintiff had a long history of mental disability. In connection with an application for VA disability benefits plaintiff was given a neuropsychiatric examination in

August 1966, and was found to be competent but diagnosed as chronic obsessive compulsive reaction. Another such VA examination was given in December 1967, and no evidence was found of thought disorder or psychosis. Plaintiff was at that time found alert and competent for VA purposes, and the prognosis was fair for his symptomatic improvement, if given adequate and prolonged psychiatric treatment. Until 1967 plaintiff was under the psychiatric care of Dr. Yochelson at the National Institute of Mental Health. At times in 1967 he was seen by Dr. Riesenman at St. Elizabeths. Plaintiff underwent psychotherapy by Dr. Berman from July 1969 to 1973. Dr. Berman diagnosed plaintiff as having an obsessive compulsive personality, with periods of psychosis from 1969 to 1973. Plaintiff was self-destructive and actively suicidal, and was too ill to undergo analytic treatments when first seen in 1969, and at the time of trial here in 1977. Dr. Berman found that plaintiff had a cyclothymic personality (i. e., excessive mood swings) and believed that he had had periods of psychosis from 1965 to 1969. He did not think that plaintiff was capable of handling his own affairs from 1965 to 1969.

In May 1969 plaintiff applied to the Air Force Board for Correction of Military Records to change his discharge record to show that he was retired on May 5, 1951, due to a service incurred/aggravated disability. Plaintiff appeared at a hearing at which he was represented by Suskind. On June 17, 1971, the Correction Board recommended that the Air Force record of plaintiff's honorable discharge be corrected to show that on May 5, 1951, he was unfit to perform the duties of his office due to a service aggravated condition of obsessive compulsive reaction rated at 10 percent disability with entitlement to severance pay. It was about that time that it first occurred to Suskind that plaintiff had a possible cause of action in the Court of Claims.

After discharging Dr. Berman in 1973 plaintiff engaged Dr. Hamman, who diagnosed plaintiff as obsessive compulsive neurosis, with marked depression. Dr. Hamman saw plaintiff 3 times weekly until February 1976, when plaintiff entered Arlington Hospital because of attempted suicide. After his release 3 months later plaintiff resumed treatments with Dr. Hamman. Dr. Hamman believed that from 1965–70, while plaintiff was competent to perform certain acts such as shopping, working, driving, composing letters, he was generally not capable of overall management of property or finances. While an obsessive compulsive person fluctuates widely in his capacity to act in his own best interests, Dr. Hamman believed that plaintiff would have been capable of signing a petition to file in a court to protect his interests.

In 1976 Dr. Stammeyer, a clinical psychologist, tested plaintiff and found his condition had substantially deteriorated since a similar test given in 1960. He diagnosed plaintiff as latent schizophrenia, and said that his obsessive compulsive condition probably existed in 1965.

In February 1976 Dr. Rappeport, a psychiatrist hired by defendant, examined plaintiff and diagnosed plaintiff as obsessive compulsive personality with sociopathic and depressive features, rather than an obsessive compulsive neurosis. The difference if any was not explained. He believed that plaintiff's condition from 1965 to 1970 would not have prevented him from comprehending or asserting his rights. Dr. Rappeport stated that "if he [the plaintiff] did not take any particular course of action from a legal standpoint during that period, it was not because he could not as a result of any mental disease or disability but because he either did not wish to or did not know that he was eligible."

The third paragraph of 28 U.S.C. § 2501 provides:

A petition on the claim of a person under legal disability or beyond the seas at the time a claim accrues may be filed within three years after the disability ceases.

The historical note to section 2501 makes clear that the words "a person under legal disability or beyond the seas at the time the claim accrues" were not designed to change

existing law, but were intended to consolidate by substitution the prior archaic terminology "married women first accrued during marriage, of persons under the age of twenty-one years first accrued during minority, and of idiots, lunatics, insane persons, and persons beyond the seas at the time the claim accrued."

■ The law presumes sanity and competency rather than insanity and incompetency. The burden of proving mental incapacity is on the claimant in order to qualify as suffering from a legal disability within the intendment of 28 U.S.C. § 2501. Hardship, inconvenience, or ignorance are not grounds for tolling the statute. *Frith v. United States,* Ct.Cl., 590 F.2d 343 (1978); *Bryant v. Associates Discount Corp.,* 251 Miss. 1, 167 So.2d 657 (1964); *Woodruff v. Shores,* 354 Mo. 742, 190 S.W.2d 994 (1945). It is possible that the statute may be tolled where the claimant's ignorance of the facts is due to their inherent unknowability, or due to their concealment by the defendant, but here the plaintiff would have a heavy burden of proof. *See Japanese War Notes Claimants Ass'n v. United States,* 178 Ct.Cl. 630, 684, 373 F.2d 356, 359, *cert. denied,* 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). Neither unknowability nor concealment by the defendant exists in the present case, nor does plaintiff contend otherwise.

■ Only a serious impediment can qualify to suspend running of the statute. The "legal disability" provision of statutes of limitations are designed to provide relief from some personal handicap or impediment affecting the individual litigant and preventing him from bringing a timely suit. *Marcos v. United States,* 122 Ct.Cl. 641, 655, 106 F.Supp. 172, 176 (1952). Strict construction of "legal disability" is reinforced by *Capoeman v. United States,* 194 Ct.Cl. 664, 440 F.2d 1002 (1971), which observes that the term does not include all kinds of mental conditions. The court held that to toll the statute a legal disability must impair the claimant's access to the court. Thus in *Capoeman* the plaintiff, an Indian, was found not unable to manage his affairs, make a will, or enter into a contract, even though he was technically a "noncompetent" in Indian law terminology, and thus could not be issued a fee simple patent to his allotted land. The court held that it could not "by judicial fiat expand our jurisdiction beyond the statutory limits established by the Congress" and decree an unlegislated exception respecting the application of the period of limitations. *Id.* at 676, 440 F.2d at 1008. Comparing Goewey to *Capoeman,* our record is silent as to Goewey's capacity to write a will or enter into a contract (we extrapolate that he could), while Capoeman was not found disabled in these respects. Capoeman was found able to manage his own affairs, but the record shows that Goewey was unable to· manage his financial affairs, witness the fact that his attorney was appointed to serve as his guardian to manage his finances.

■ Although this court has not defined "legal disability" it has held that narcotic addiction does not in itself constitute a statute-tolling legal disability unless the claimant alleges and shows that he was "incapable of understanding the nature of his discharge", which he sought unsuccessfully to change. *Cochran v. United States,* 205 Ct.Cl. 876 (1974). The term "insane"[1] or of "unsound mind" as used in a statute relating to the effect of disabilities on the statute of limitations means a condition of mental derangement which renders the sufferer incapable of caring for his property, of transacting business, of understanding the nature and effect of his acts, and of comprehending his legal rights and liabilities. *Hornig v. Hornig,* —— Mass.App. ——, 374 N.E.2d 289 (1978); *Hsu v. Mt. Zion Hospital,* 259 Cal.App.2d 562, 66 Cal.Rptr. 659 (1968); *Peach v. Peach,* 73 Ill.App.2d 72, 218 N.E.2d 504 (1966); *Kyle v. Green Acres at Verona, Inc.,* 44 N.J. 100, 207 A.2d 513

---

1. DORLAND'S MEDICAL DICTIONARY, 25th ed., defines insanity to mean "mental derangement or disorder." It "is a social and legal term rather than a medical one, and indicates a condition which renders the affected person unfit to enjoy liberty of action because of the unreliability of his behavior with concomitant damages to himself and others."

(1965); *Browne v. Smith,* 119 Colo. 469, 205 P.2d 239 (1949); *Stair v. Gilbert,* 209 Ky. 243, 272 S.W. 732 (1925); *Pearl v. Pearl,* 177 Cal. 303, 177 P. 845 (1918). Variations proceed from this general definition, all of whose elements need not be present in each case. In *MacDonald v. Boslow,* 363 F.Supp. 493 (D.Md.1973), it was held that the purpose behind a Maryland statute providing a mental incompetency exception to the statute of limitations was the protection of "that group of individuals whose functioning was so severely impaired as to render them incapable of husbanding a presently existing known right."

■ The statutory "legal disability" should require a mental derangement precluding a person from comprehending rights which he would be otherwise bound to understand. *Williams v. Westbrook Psychiatric Hospital,* 420 F.Supp. 322 (E.D.Va. 1976); 54 C.J.S. *Limitation of Actions* § 242 (page 269); *Hoffman v. Keller,* 193 F.Supp. 733, 735 (D.Ore.1961).

■ Thus Goewey's particular variety of mental incompetence, in order to qualify as a statutory "legal disability", must in some way prevent his comprehension of his legal rights to military disability retirement pay, the necessity of prosecuting them by timely suit, and/or cause him to deliberately forego the filing of a timely suit to vindicate his rights. Conceivably plaintiff's compulsion to issue bad checks, as a product of his particular mental illness, might toll the statute with respect to litigation involving some aspect of plaintiff's finances, but no cause and effect relationship can be detected preventing him from protecting his legal rights to disability retirement pay by filing suit. His failure was not for want of acumen, for his vigorous participation in efforts to effect release from St. Elizabeths by filing habeas corpus petitions, and his active involvement in the years under consideration in efforts to secure VA benefits for himself and his family, in defending his criminal prosecutions, and in resisting recommitment to St. Elizabeths, make it abundantly clear that plaintiff was able to understand such complexities and was decidedly not adverse to protecting his interests to the utmost.

Additionally we know that plaintiff was released from St. Elizabeths in 1965 as cured, and that both during and since his confinement there he was always diagnosed as competent. The record defines "competent" as plaintiff's ability to understand the nature of charges against him, but we are not at all convinced that this is the full meaning of the term. The overwhelming consensus of psychiatric testimony is that plaintiff, although suffering from an obsessive compulsive neurosis, was in contact with his surroundings (reality), intelligent, well educated, and adept at "conning" others, which latter is taken to be the vernacular for deception.

Plaintiff's cognitive functioning ability throughout his confinement in St. Elizabeths was manifest. While there he made both business and legal decisions furthering his interests, wrote magazine articles, and executed an agreement with another patient pertaining to financial arrangements. Medical entries attested his competence to do so. During the 5 years following his release from St. Elizabeths plaintiff was continuously involved in varied correspondence affecting his interests, often drafting letters and at other times typing or only signing them. This decade of activities reflects a mind well able to recognize what served plaintiff's interests and a purpose to prosecute them, without apparent impediment from his underlying mental condition, which evidenced itself in conduct completely extraneous to his transactional competency. If presented with a petition ready to be filed in this court there is no reason to doubt that he would have executed and filed it with full understanding of its significance. In *Thlocco v. Magnolia Petroleum Co.,* 141 F.2d 934 (5th Cir. 1944), *cert. denied,* 323 U.S. 785, 65 S.Ct. 276, 89 L.Ed. 627 (1944), the defendant was adjudged by the county court to be an incompetent person for whom a guardian was appointed because she could not properly handle her business affairs. The court held that this was not necessarily proof that the individu-

al was an insane person, or a person of unsound mind within the disability exception that tolled the statute of limitations. The present plaintiff's admitted incapability of managing his financial affairs, when set against his competence to stand trial, to understand adverse proceedings, to assist in his own defense, and to follow legal instructions in the furtherance of his own interests, does not on balance qualify him as being legally disabled within contemplation of the statute to file a timely suit for military disability retirement. It is obvious that the feasibility of the instant suit did not occur to plaintiff or his counsel until it was too late.

Even if the facts established a legal disability within the intendment of section 2501, the disability was not proven to be continuous during the 5-year period in question. The need for continuity of the incompetency is ruled in *Marcee v. United States,* 197 Ct.Cl. 363, 455 F.2d 525 (1972), which held that the conservator-plaintiff had the burden of proving the continuity of his ward's incompetence. The general rule is that after the termination of a legal disability the statute of limitations commences to run and the tolling is not reinstated by a recurrence of the disability. *De Arnaud v. United States,* 151 U.S. 483, 14 S.Ct. 374, 38 L.Ed. 244 (1894); *McDonald v. Hovey,* 110 U.S. 619, 621, 4 S.Ct. 142, 28 L.Ed. 269 (1884); *Oliver v. Pullam,* 24 F. 127 (C.C.N.C.1885); 41 A.L.R.2d 726. A lucid interval starts the statute running, not to be suspended by a resumption of disability. 51 Am.Jur. *Limitation of Actions* § 190. Goewey's underlying mental condition, which continues to date, varied greatly and frequently in severity, with substantial exacerbations and remissions. During his many and extended lucid periods, between spells of profound depression and self-destructive—even suicidal—tendencies, he was fully capable of having the wit and the will to file a timely suit. Dr. Hamman, a psychiatrist who had treated plaintiff, testified that in his expert opinion plaintiff would have signed a suit for filing in this court if it had been prepared for him.

To repeat, under the order of remand my recommendation to the Appellate Division is that, from July 16, 1965, when plaintiff was released from St. Elizabeths to December 3, 1970, which was 3 years prior to the filing of plaintiff's petition on December 3, 1973, plaintiff was not suffering from a legal disability within the intendment of the third paragraph of 28 U.S.C. § 2501 which would excuse his failure to file a timely suit.