**Howard Paul COBB, Plaintiff–Appellee,**

**v.**

**K.A. NIZAMI; S.B. Cruz; F.A. Salanguit; Adoracion S. Baldonado; Ernest Castillo; Vincent Zabak; Manuel Lucero, and all other unknown, unnamed physicians, presently employed at Weston State Hospital in Lewis County, West Virginia, who examined and treated, or prescribed treatment for Howard Paul Cobb at Weston State Hospital during the period of time from January 1, 1974 through the present, Defendants–Appellants,**

**and**

**A.H.S. Ali; Mario Ramirez; M. Zafiruddin; Rodolfo C. Nellas, Defendants.**

**No. 87–3731.**

United States Court of Appeals, Fourth Circuit.

Argued March 10, 1988.

Decided July 15, 1988.

Rehearing and Rehearing In Banc Denied Aug. 10, 1988.

Paul Richard Hull, Sr. Asst. Atty. Gen. (Marion E. Ray, Asst. Atty. Gen., Charleston, W. Va., on brief) for defendants-appellants.

Robert F. Cohen, Jr. (Richard Paul Cohen, Cohen, Abate & Cohen, Fairmont, W. Va., on brief) for plaintiff-appellee.

Before RUSSELL and HALL, Circuit Judges, and BUTZNER, Senior Circuit Judge.

K.K. HALL, Circuit Judge:

This is a case for money damages arising from Howard Paul Cobb's treatment by defendants, Drs. Nizami, Cruz, Salanguit and Hao (formerly Baldonado), at Weston State Hospital ("Weston").[1] In addition to his 42 U.S.C. § 1983 and medical malpractice claims, Cobb alleged that he was denied treatment due to an inappropriate diagnosis.[2] Following a trial before a magistrate, the jury returned a verdict in favor of Cobb on all three claims and assessed damages at $300,000. The court denied defendant physicians' motion for judgment notwithstanding the verdict and motion for new trial. Finding that Cobb was not under a disability which would toll the applicable statute of limitations, we reverse.

## I.

Howard Cobb is a young man who spent virtually his entire childhood and adolescent-teen years in state mental institutions of one description or another.[3] Within a month of his arrival in Weston in July, 1973, Cobb was examined by Dr. Robert B. Bell, a licensed clinical psychologist. Dr. Bell found Cobb to have a full scale I.Q. of 79 and to be borderline mentally retarded with psycho-social (environmental) deprivation. He recommended that a behavior modification treatment program be implemented, similar to a program devised and utilized successfully for Cobb while at the Colin–Anderson Center.

For reasons which were hotly disputed by the parties, the plan recommended by Dr. Bell was never implemented.[4] Instead, Cobb's treatment consisted of antipsychotic medication, seclusion, restraints, and such educational and vocational programs as were available. The antipsychotic medication administered to Cobb consisted mainly of the drug Mellaril, used in the treatment of behavioral disorders.[5] The evidence also indicates that Cobb was restrained to a bed with strips of cloth, for several hours at a time, when he became combative or violent. At other times, he was placed in seclusion either in a seclusion room or next to an aide station.

Significantly, Cobb was released from Weston on three occasions, as a result of self-initiated writs of habeas corpus. In addition, while being examined by Dr. Ravell during one of his commitment proceedings, Cobb presented a handwritten list of complaints and grievances that he had against the institution. On July 14, 1977, Cobb was released from Weston, on a writ of habeas corpus, for the last time.

After his release from Weston, Cobb visited an attorney, William E. Rowe, in regard to some financial matters unrelated to this lawsuit. Shortly thereafter, Cobb consulted with a Legal Aid attorney, William Byrne, about filing a lawsuit against Weston and several treating physicians.[6] On August 25, 1977, Cobb signed and gave to Byrne an "Authorization for Release of Information Records" authorizing the North Central West Virginia Legal Aid Society to obtain Cobb's medical records in

1. Weston is a West Virginia state psychiatric hospital maintained for the treatment of the mentally ill.

2. See W.Va.Code § 27–5–9.

3. Cobb was removed from his family at the age of five, after being sexually abused by his father. In the twelve years that followed, he was placed in the West Virginia University Medical Center (twice), with the family of the Governor of West Virginia (twice), in the Children's Home in Elkins, in Lakin State Hospital (twice), and in Colin–Anderson Center.

4. Cobb contended that the staff at Weston showed deliberate indifference to his medical needs, while defendants maintained that, due to

overcrowding and understaffing, Weston totally lacked a mental retardation training component.

5. While at Weston, Cobb exhibited aggressive and destructive behavior, physically and sexually assaulted other patients, and allegedly attempted suicide.

6. In accordance with the policy of Legal Aid in regard to fee-generating cases, Byrne informed Cobb that he must first be rejected by three private attorneys before he would take his case. After complying with this requirement, Cobb returned to see Byrne at Legal Aid.

order to investigate his case. For reasons which are not clear, Byrne never filed suit on behalf of Cobb.

On October 13, 1979, two years and 92 days after his release from Weston, Cobb filed this suit in the United States District Court for the Northern District of West Virginia. In addition to defending on the merits, the defendants asserted the West Virginia two-year statute of limitations. Cobb, however, contended that his lack of mental capacity tolled the limitations period until at least October 15, 1977. On June 10, 1987, the jury returned a verdict against Drs. Nizami, Cruz, Salanguit, and Hao on all three of the aforementioned claims and assessed damages at $75,000 against each defendant. By memorandum order, dated July 24, 1987, the trial court denied defendants' motions for judgment notwithstanding the verdict and for a new trial. Appellants challenge the denial of these motions.

## II.

On appeal, defendants contend that the district court erred in denying their motion for judgment notwithstanding the verdict because there was insufficient evidence to support a verdict of medical malpractice; they were entitled to judgment on the basis of their "good faith defense;" and Cobb's claim was barred by West Virginia's two-year statute of limitations. Since we conclude that Cobb was competent to prosecute his claim well before October 13, 1977, and that his claims were therefore time barred, we decline to address appellants' other contentions.

W.Va.Code § 55–2–15 provides that:

If any person to whom the right accrues to bring any such personal action, suit or scire facias, or any such bill to repeal a grant, shall be, at the time the same accrues, an infant or *insane*, the same may be brought within the like number of years after his becoming of full age or sane that is allowed to a person having no such impediment to

bring the same after the right accrues, or after such acknowledgment as is mentioned in section eight [§ 55–2–8] of this article, except that it shall in no case be brought after twenty years from the time when the right accrues.

(Emphasis added).

Although there has been no definitive interpretation of § 55–2–15 by the West Virginia Supreme Court of Appeals, the term "insane" as used in similar statutes has been held by other courts to mean "such a condition of mental derangement as actually to bar the sufferer from comprehending rights which he is otherwise bound to know." *Williams v. Westbrook Psychiatric Hospital*, 420 F.Supp. 322, 325 (E.D.Va.1976). Stated another way, " 'insane' or of 'unsound mind' ... means a condition of mental derangement which renders the sufferer incapable of caring for his property, of transacting business, of understanding the nature and effect of his acts, and of comprehending his legal rights and liabilities." *Goewey v. United States*, 612 F.2d 539, 544, 222 Ct.Cl. 104 (1979).

Cobb's evidence that he was "insane" within the meaning of W.Va.Code § 55–2–15 consisted primarily of the testimony of attorney William Byrne. Byrne testified that when Cobb visited him in the summer of 1977, the plaintiff exhibited "bizarre" behavior, was incoherent, and appeared unable to assist in his legal situation. On cross-examination, however, Byrne admitted that he didn't believe that Cobb needed to be institutionalized, nor did he think it necessary to have a guardian or committee appointed to handle Cobb's affairs. Cobb was also able at this time to execute and present to Byrne an authorization for release of his medical records. More importantly, the record plainly indicates that Cobb effectuated his release from Weston on at least five occasions between 1973 and 1977, three times by judicial writ, and twice by filing a "96 hour notice" after he was voluntarily hospitalized.[7] Cobb's contention that he was un-

---

7. W.Va.Code § 27–4–3 provides, *inter alia*, that a voluntary patient who requests his release from a mental health facility must be released

unless "... within ninety-six hours of the receipt of the request, the chief medical officer ... files

able to understand his injury and unable to prosecute his claim on or after October 15, 1977, is simply unbelievable. In fact, it is undisputed that Cobb contacted attorney Rowe, shortly after his release from Weston in 1977, to assist him in handling his financial matters. A careful review of these events demonstrates that, during the period in question, Cobb was not "incapable ... of comprehending his legal rights and liabilities ..." so as to toll the two-year statute of limitations. *See Goewey,* 612 F.2d at 544.

In determining whether to grant a motion for judgment notwithstanding the verdict, the nonmoving party must be given the benefit of every legitimate inference in its favor, and the motion must be denied if there was evidence upon which the jury could *reasonably* return a verdict for him. *Mays v. Pioneer Lumber Corp.,* 502 F.2d 106 (4th Cir.1974) (emphasis added). Based upon the evidence presented, the jury's verdict that Cobb's suit was not barred by the applicable statute of limitations fails to meet this standard and was clearly unreasonable. The district court's order denying defendants' motion for judgment notwithstanding the verdict is, therefore, reversed, with instructions that on remand judgment be entered in favor of defendants.[8]

REVERSED AND REMANDED.

BUTZNER, Senior Circuit Judge, dissenting:

I agree with the district court that there was sufficient evidence to support the jury's finding that Howard Cobb was insane and that consequently the West Virginia statute of limitations should be tolled for a period of at least 92 days after he was released from a psychiatric institution.

I

The question to be resolved in deciding a motion for judgment notwithstanding the

... an application for involuntary hospitalization...."

8. Our decision in this case should in no way be interpreted as condoning the actions of defendants, and especially the State, in their treatment of Cobb. The record reflects that Cobb, while committing no crime, was misdiagnosed,

verdict is whether there is evidence upon which a jury can properly find a verdict. *Ralston Purina Co. v. Edmunds,* 241 F.2d 164, 167 (4th Cir.1957). In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. 9 Wright & Miller, *Federal Practice & Procedure* § 2524 at 543–44 (1971). The nonmoving party must be given the benefit of every legitimate inference in his favor. *Mays v. Pioneer Lumber Corp.,* 502 F.2d 106, 107 (4th Cir.1974). Tested by these familiar precepts, the jury's verdict, which was accepted by the district court, should be sustained.

II

Credible evidence depicted Howard Cobb's mental condition immediately following his release from Weston. William Byrne, an attorney and the only witness testifying about direct personal contact with Howard during the period following Howard's release, said that Howard behaved bizarrely on every occasion that he met with Byrne. He testified that Howard's conduct was "out of control," "incoherent," "irrational," and at times frightening. Byrne also testified that Howard could not articulate his reasons for requesting Byrne's help and that he was unable to sustain a rational conversation. Byrne also noted a striking contrast between Howard's conduct and demeanor at trial and his conduct when Byrne first met him immediately after his release from Weston. Finally, Byrne said that, based on his contacts with Howard, Howard's mental derangement apparently persisted for several months.

I do not accept the argument that the jury's verdict should be overturned because

overmedicated, physically restrained and placed in seclusion for extended periods of time. Although we cannot say that the physicians failed to exercise their professional judgment, the evidence suggests that the standard of care Cobb received was far less than adequate.

Byrne did not feel that a legal guardian should have been appointed for Howard or that Howard should have been reinstitutionalized. Not all insane persons need to be institutionalized or to have a guardian appointed for them. In fact, some schools of psychiatric thought hold that under certain circumstances deinstitutionalization of the insane can promote mental health. *See Eanes v. United States,* 407 F.2d 823, 824 (4th Cir.1969). Certainly, most modern psychiatrists prefer less restrictive forms of treating the mentally ill over institutionalization where possible.

In addition, Dr. Wilbur Sine, an expert witness Board Certified in psychiatry, testified that after Howard's release, Howard continued on the medication which was prescribed for him at Weston. He expressed an opinion that, given Howard's psychiatric history and treatment at Weston, Howard probably would have been unable to interact effectively with others or assist his lawyer in preparing a lawsuit for at least six months after his release from Weston.

Finally, Howard himself testified that after he was released from Weston, he was confused and behaved in socially unacceptable ways. His condition was serious enough for him to receive outpatient care by a psychiatrist at a mental health facility.

The testimony of Byrne, Sine, and Howard was sufficient to support the jury's finding about Howard's insanity. The jury had the advantage that this court did not have of observing the witnesses' demeanor in assessing their credibility and the weight to assign to their testimony.

Although Howard was lucid enough to seek release from Weston on several occasions, his actions do not justify overturning the jury's verdict. Just because Howard was able to effectuate his release from Weston does not mean that he was sane enough to assimilate and articulate what had happened to him while he was at Weston or cooperate with an attorney in the prosecution of a complex civil suit. There are varying degrees of insanity. A person can be mentally deranged and yet be able to perform some tasks and cooperate with others on a limited basis. There may be other tasks which are completely beyond that person. Howard spent most of his life in an institution. His confinement at Weston was a traumatic experience. It was reasonable for the jury to have determined in light of those facts that while Howard was capable of employing familiar, uncomplicated means to obtain release from Weston and other institutions, he was incapable for at least a period of 92 days after his release from Weston of comprehending his legal rights and pursuing their vindication.

By instructions, to which no error has been assigned, the court fully explained to the jury the bar of the two year statute of limitation and the mental disability necessary to avoid the bar. The jury found that Howard was not competent to file this action within the limitation period. The district court, reviewing the evidence, refused to set aside the jury's verdict. It is not an appellate court's function to reassess the credibility of the witnesses or to substitute its judgment of the facts for that of the jury. Dissenting, I would affirm the judgment entered in Howard's favor on this issue.